G. & C. MERRIAM CO. v. SYNDICATE PUB. CO.

(Circuit Court of Appeals, Second Circuit.    June 18, 1913.)

No. 210.

1. TRADE-MARKS AND TRADE-NAMES (§ 73*)—UNFAIR COMPETITION—WEBSTER'S DICTIONARIES.

Any publisher of a dictionary which is an abridgment of or a revision or compilation based on the original Noah Webster dictionaries has the right to use the name "Webster" as a descriptive part of its title; the direct successor of the publisher of the original Webster, whose present day publications are of precisely the same character in their relation to the original, having no exclusive right to the name or to require more than that other and later publishers shall clearly distinguish their works from its own.

· [Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 84; Dec. Dig. § 73.*

Unfair competition in use of trade-mark or trade-name, see notes to Scheuer v. Muller, 20 C. C. A. 165; Lare v. Harper & Bros., 30 C. C. A. 376.]

2. EVIDENCE (§ 318*)—HEARSAY—EXCEPTIONS TO RULE EXCLUDING.

A statement by the compiler in the preface to a dictionary published in 1850 that he had adopted Webster's dictionary as the basis for his own, correcting and adding to the same to bring it down to the date of publication, is admissible in evidence as within an exception to the rule which excludes hearsay.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 1193–1200; Dec. Dig. § 318.*]

Appeal from the District Court of the United States for the Southern District of New York.

Suit in equity by the G. & C. Merriam Company against the Syndicate Publishing Company. Decree for defendant, and complainant appeals. Affirmed.

The following is the decree and opinion of Hand, District Judge, in the trial court:

[1] The complainant has never succeeded in getting from any court a decree which would forbid the publication of a "genuine" Webster dictionary in the form in which the defendants were selling theirs at the time these suits were started. The defendants had not only conformed in every way to the terms of the decree in the case of Merriam v. Ogilvie (C. C.) 149 Fed. 858, as it was finally entered, but they had advised the complainant of their submission to the law as there laid down and of their purpose in future to adhere to it.

The complainant brings this suit upon the theory that the book published (for the two books are nearly identical in content) is in fact not based upon Webster's dictionary at all; that it has no right to be called Webster's Dictionary in any sense; and that it is a fraud to call it such. Indeed, they do not concede that any one has any right but themselves to use the word "Webster's" upon a dictionary, unless it be one of the original dictionaries published by Webster himself, and even in that case they insist that it must be distinguished by the statement that it is one of the original Webster's dictionaries, a fact which would probably destroy any possibility of its sale anyway. Their pretension extends even to the point of forbidding the sale of any dictionary honestly compiled upon Webster's original sources, since they assert that the name "Webster," when applied to any such compilation

or abridgment, necessarily implies their own responsible supervision and authorship. I have not, however, the least doubt at the outset in overruling so extreme an assertion as this. It is quite clear that any honest compilation or abridgment at the present time of Webster's work is entitled to describe itself as such, and that the most which the complainant's supposed right could in any case do would be adequately to indicate that a work so described was not a compilation or abridgment by the original publishers of Webster's Dictionary or their successors. Indeed, it is a preposterous assertion to say that the name "Webster's," as at present used by the complainants themselves, does not indicate to the public mind that their work has some connection with Webster's original work other than that they choose to publish it, or that it need not be the result of a legitimate literary descent from his original. In other words, even though the word indicates prima facie · that the book is the complainant's compilation, it also still indicates that it is a compilation with Webster as its original source, and it is in this sense that Judge Coxe spoke when he said that the word had two meanings, a proprietary and a descriptive. Nor is there any inconsistency in such a dual meaning; the word may mean "Merriam's Compilation from Webster" quite as well as "Merriam's Compilation." If it does, it must as well answer to one part of its definition as to another; in short, it must be a compilation from Webster or it is a fraud. I pay not the least attention to those witnesses who say that it means only "Merriam's Compilation." If the name "Webster" has this descriptive significance, it is quite clear that it will also honestly describe any actual compilation from any one of Webster's dictionaries, provided that some suffix be added to distinguish the compilation from Merriam's. The word need not by any means be confined to the original work of Webster himself. Indeed, the only authority which has ever independently given the complainant any trade rights in the name "Webster" itself refused absolutely to forbid the defendant from using the name upon what was in every sense a compilation.

In Merriam v. Ogilvie (C. C.) 149 Fed. 860, Judge Colt says that Ogilvie's work was an enlarged and revised edition of the Webster of 1847. Now the edition of 1847 was not by any means a simon-pure Webster, for its title page asserts that, although it contained the whole vocabulary of the first edition in two volumes, the entire corrections and improvements of the second edition (both by Noah Webster), it had been revised and enlarged by Chauncey A. Goodrich. Just what the abridgment from two volumes to one involved and just what was the revision and enlargement of Goodrich which accompanied the abridgment added does not appear, but it does appear that the work which the Circuit Court of Appeals of the First Circuit permitted to bear the name "Webster" had passed through two revisions of one sort or another, and this is enough to dispose of the assertion that the only work which may be called "Webster" is some book just as it left the hands of Noah Webster.

The first question, therefore, which arises is whether the dictionary in question was based upon Webster's original work in such sense that it is entitled to be known by that name. In the solution of this question I am not disposed to enter into any nice considerations of a literary character, such, for example, as Professor Peck suggests, as to what creates a Webster's dictionary. For it is quite clear that, whatever scholars may think, the public generally (and it is the public with whom we are now concerned) mean something else by the words in question. What is it that they do mean, either by a Webster's dictionary or a dictionary based upon Webster's? It seems to me that they mean the way the book has been made up more than its present contents, its history rather than its present identity with its source. The word at least denotes what I should call literary descent from Webster's original books (that is, that each book in the series, of which this is the last, was made up by its author with its predecessor before him, only changing the spelling, definition, vocabulary, and the rest as his opinions and learning indicated to him that changes were required to adapt the book to the present); and that this succession goes back without break to some work by Webster himself. Nor is it indeed possible for the complainants to take any other position than this without putting themselves in the position of foisting upon

the public a spurious work. Their own last edition (that of 1909) is a book of almost totally different literary contents from any book with which Noah Webster had anything to do. They have the alternative of accepting the definition of "Webster" as indicating this kind of descent or of maintaining that "Webster" means any work of theirs and has no descriptive significance whatever. Otherwise they are within the rule in the California Fig Syrup Case. Of course, a "Webster" dictionary must own Webster as its father originally; and in the case at bar, although the heredity of the complainants' 1909 Webster is all that gives it its character as a Webster, yet it still has that character, remote now as the content may be. The complainant is in no position to deny a purely descriptive use of the word to any other dictionary which is as legitimate as its own. The constant iteration that all such are "bogus" or not "genuine" is merely a childish extravagance.

Now, does the defendants' book answer this description as well as the complainant's? The complainant has established beyond any question, in my judgment, that the immediate basis of the Crown Dictionary was the British Empire Dictionary, which has been put in evidence in this case, and which was edited by the Rev. E. D. Price, F. G. S. The proof of this consists in the identity of the literary matter between the two, which is so great as to be substantially identical. The parties in taking testimony have proceeded upon the assumption that the kinship between dictionaries may be ascertained by examining the verbal identities in the contents. Thus, at what must have been an appalling labor they have each prepared tables showing the identity of subject-matter between the defendants' book and others. It so happens under the complainant's table that, of all those examined, the closest in content to the British Empire Dictionary is Ogilvie's Imperial Dictionary of 1883. The similarity of contents extends to 70 per cent. of literal identity: that is to say, 70 per cent. of the contents of the British Empire Dictionary appears verbatim in the Imperial. The identity in the case of the Concise Oxford is only 28 per cent., and of what I am tempted to call the non-Websterian group ranges from there to about 40 per cent. Considering the difference in time of their appearance, this identity with the Imperial is adequate prima facie proof that the former is the literary descendant of the other and, in the absence of contradiction, justifies me in so assuming, when compared with the extremely low percentages of the other more or less contemporaneous works. Certainly one who advertises that work as a Webster which has scarcely any of Webster's matter within its covers cannot afford to be too meticulous. It also so happens that the first edition of the Imperial Dictionary published in 1850 is in evidence written by the well-known lexicographer, John Ogilvie. The title page of this work says that it is "on the basis of Webster's English Dictionary," while the preface, dated December, 1849, more fully states the sources. Thus, on page iii of this preface appears the following: "In adopting Webster's dictionary as the basis of the Imperial dictionary, the great object of the editor in preparing the latter has been to correct what was wrong and to supply what was wanting in Webster in order to adapt the new work to the present state of literature, science, and art. Accordingly, every page of Webster has been subjected to careful examination, numerous alterations and emendations have been made, a vast number of articles have been rewritten, very many of Webster's explanations of important terms have been enlarged, and many new and correct definitions of others given; new senses have been added to old words where they were found wanting, and a multitude of new words and terms have been introduced, especially in the scientific and technological departments, so that, to Webster's addition of 12,000 to Todd's Johnson, a further addition has been made of at least 15,000 words and terms."

Now that is exactly what I think the public means by a "Webster" brought up to the time of its publication, and it is in exactly this sense, and only in this sense, that the complainant has any right to continue to call its present dictionaries "Webster's," whether or not it indicates the complainant's own compilations when not accompanied by any suffix. Certainly Ogilvie could have called the Imperial Dictionary either "Ogilvie's Webster" or the "Imperial Webster," or any other kind of "Webster" that he wished. The successive editions certainly were Webster dictionaries, and so were any smaller

works, derived from those editions, whether abridgments, condensations, or the like. Nor does it seem to me to matter that the intermediate sources did not go by the name Webster. Here, for example, is a work which comes down by precisely the same kind of line of descent from Webster·that the complainant's present abridgments come; each individual in the line being formed from its predecessor by some accretion, some elimination, some amendment, till one reaches the work of Webster himself. When the public uses "Webster," does it understand that all the intermediate steps shall have been so named? I hardly think so. Rather, it seems to me, it is the fact of its unbroken descent that the word implies. Rolfe, a concededly fair witness, was asked his opinion upon this question, and, while I should not feel in the least bound by it, I should be very glad to give it weight, if I could understand what he meant by his answers. He says it would justify the use of the title "Webster's Dictionary" if the book were taken from Ogilvie (that is, if Ogilvie could be called an English Webster); but that though justifiable it was not a natural thing to do, and that he personally, from a literary point of view, should not use it. So far as this means anything, it is that in the witness' opinion the name could honestly be used. Therefore I believe that the defendants have shown that their dictionary is really a Webster entitled to be so called quite as much as the Ogilvie's in the suit of Merriam v. Ogilvie. Are the statements in Ogilvie's preface competent as evidence?

[2] Ogilvie's preface is of course an unsworn statement, and as such only hearsay testimony, which may be admitted only as an exception to the general rule. The question is whether there is such an exception. I have been unable to find any express authority in point and must decide the question upon principle. In the first place, I think it fair to insist that to reject such a statement is to refuse evidence about the truth of which no reasonable person should have any doubt whatever, because it fulfills both the requisites of an exception of the hearsay rule, necessity and circumstantial guaranty of trustworthiness. Wigmore, §§ 1421, 1422, 1690. As to necessity, it is a statement made by a man now dead about his own conduct in the compilation of his own work.· I say he is dead because he had completed a large dictionary some 63 years ago, and it is a fair presumption that he was at least 37 years old when the work appeared. Moreover, the Dictionary of National Biography, which is certainly the standard work upon the subject, gives the date of his death as 1867. Besides Ogilvie, everyone else is dead who ever knew anything about the matter and could intelligently tell us what the fact is. It is true that internal evidence remains, but this very case shows that it is hard to be certain in one's inferences from it. If this be not evidence I can see no way of getting any better, and the fact cannot be established at all. Surely the law is not so unreasonable as that.

As to the trustworthiness of the testimony, it has the guaranty of the occasion, at which there was no motive for fabrication. A claim of originality might be suspicious, but one of obligation is not. Whether Ogilvie claimed as his source Johnson or Webster was not a matter which he would be likely to misstate. Ogilvie was a lexicographer of note and the "Imperial Dictionary" was for long one of the standards of English speech, and there is in reason every ground for accepting as presumptively true a statement of this kind made at this time and place. The evidence is not conclusive as matter of law, a circumstance which many judges seem to forget in discussing the dangers of unsworn testimony. Ogilvie may of course have been a malingerer; he may have been employed by unscrupulous publishers to assert a derivation which was untrue; but such considerations would operate to exclude nearly all testimony ever given in a court of law.

In spite of these considerations, however, if there be any absolute rule of law that forbids such proof, I may not regard it, whether or not I like the results. Now it is perfectly well settled that courts will use dictionaries and other reliable works of reference as occasion may require. Brown v. Piper, 91 U. S. 37, 23 L. Ed. 200; Nix v. Hedden, 149 U. S. 304, 13 Sup. Ct. 881, 37 L. Ed. 745; Western Assurance Co. v. Mohlman Co., 83 Fed. 811, 28 C. C. A. 157, 40 L. R. A. 561 (C. C. A. 2d Cir.); Koechl v. United States, 84 Fed. 448, 28 C. C. A. 458 (C. C. A. 2d Cir.). They are accepted because the circumstances attending their preparations guarantee their reliability, but

they remain none the less unsworn statements of fact or opinion. In the case at bar, Ogilvie's definitions and spellings, which are only his opinions as to what English usage then permitted, would certainly be accepted in any court, and the only way in which I can rationally exclude his statement of the sources from which those opinions proceeded is by finding some ground in reason for distrusting the one which does not apply to the other. There is no such ground, and the admissibility of the work as a reliable authority must carry with it the explanatory portions. It may be that on authority a statement quite disconnected with the book's substance would not go in, irrational though that result might be. Thus, if Ogilvie had put in his preface that he married at the age of 30, authority might rule it out; but, if the law admits his learned opinions at all, it would, in my judgment, be quite absurd to refuse also to admit his statement about their derivation. That one should admit his conclusions as reliable but not his statements of the means by which he reached them is more of a strain than the law of evidence can carry.

The attitude of the Circuit Court of Appeals for the Second Circuit upon such questions is liberal rather than narrow. Western Assurance Co. v. Mohlman Co., supra, 83 Fed. 820, 821, 28 C. C. A. 157, 40 L. R. A. 561. Wigmore, §§ 1691–1701 while recognizing that upon authority the matter is doubtful, takes, as he always does, a wise and rational view towards such proof. I can find no controlling authority which requires me to reject the statements as evidence, and I shall accept them as such.

Therefore the defendants had the qualified right to call their books "Webster's," provided they properly distinguished so as to cut out the secondary meaning, and the only question which can remain is whether the statement upon the title page of the books is sufficient notice, since the books were properly marked upon the back. The form of the notice is that set forth in the final decree of the Circuit Court for the District of Massachusetts, as contained in G. & C. Merriam Co. v. Saalfield, 190 Fed. at page 931, 111 C. C. A. 517. The only criticism which I can make upon the printing at the top of the page is that it is in rather small type. Had the attitude of the complainant been different when the defendants approached it with a view of adopting their makeup to the terms of the Massachusetts decree, I might now be willing to take up the question whether that notice ought not to be more conspicuous upon the page, but I am not disposed to indulge this complaint in such a way in the case at bar. When the defendants each approached its officers in a bona fide effort to accommodate themselves to the utmost rights which the complainant had up to that time enjoyed, they were met with a demand for absolute discontinuance of the name; they are met with it here. This was illegal and had been so adjudged against this complainant in the very decree which is the basis of any supposed right they may have in the name "Webster." They certainly by such a claim absolved the defendants from any nice adaptation of their typography to the terms of that decree, and I shall not inquire whether it gives the fullest protection to which the complainant is entitled.

I have decided this case upon the assumption that the word "Webster" had acquired a secondary meaning, indicating at once the derivation of the work and its responsible compiler. That assumption I make in deference to the decision in the First Circuit, though it is in no sense authoritatively binding upon me. There are several reasons why, if it were necessary, I should not hesitate to re-examine that question of fact. In particular the defendant in that case did not contest the question, at least after the first decision, as his briefs show, nor did he contest it in the case in the Sixth Circuit. Moreover, the record must have been quite different in that case, for Judge Colt could say that no one but the complainant published any Webster dictionaries between 1847 and 1889, a fact abundantly disproved in the case at bar. I need not here decide the question of secondary meaning, and I accept, since it has not been necessary to question it, the result of the decision in the First Circuit, which is the first success the complainant has ever had in its long and persistent efforts to establish a monopoly over the word "Webster." Nevertheless this case can never be truthfully cited as in the slightest degree contributing to the establishment of that result or indicating that I

assent in any way to the claim of secondary meaning. That question I leave exactly as I find it, without deciding that the meaning exists, that it does not exist, that it has been proved, or that it has not been proved.

I have looked over all the advertisements of the Syndicate Publishing Company, which make a very shoddy kind of appeal, but after the date when the defendants attempted to come to terms with the complainant they appear usually to bear the addition which the complainant procured as the measure of its relief in the Ogilvie Case. As to those which do not and which for the most part are in the form of news articles, I find no evidence to contradict the bona fides of the defendant's efforts to conform the advertisement with the decree, and I am not disposed to charge them with such as continued to appear. The prominence and form of the suffix must be held satisfactory in view of the complainant's attitude towards the defendant when approached and its illegal claim of a monopoly in the name. If the defendant was content to yield to the terms of the Ogilvie decree, it might, upon the complainant's demand, have been subject to some modification of its advertisements as of its title page. That right justified no such proceeding as this, designed to do just what the complainant was forbidden to do in the First Circuit.

As to the Cupples & Leon Company, I am in more doubt; the testimony of Leon is of very unsatisfactory character, and his claims to a dictionary upon which the defendant had done any substantial work are not justified. The advertisements are not warranted by the facts, for it is in no sense the modern book it professes to be. I do not believe that the defendant knew or in the least cared what was its contents, if it would sell as an up-to-date book. However, that gives no rights to the complainant, so long as its own limited use of the name is not infringed. None of the advertisements attempt to pass off the books as the complainant's, and it cannot object that the public is buying as a modern Webster substantially the old Crown Dictionary. The law may some day protect one man who sells a sound quality of goods so described against another who sells an unsound quality, dishonestly described, but it has not done so yet. Now we trust to the public to find out that they have been hoodwinked and to distinguish. Moreover, it does not certainly appear that the defendant is responsible for its customers' advertisements.

Both bills will be dismissed, with costs.

W. D. Guthrie, of New York City (W. B. Hale, of New York City, of counsel), for appellant.

H. A. Bayne and Strong & Cadwalader, all of New York City (Lauren Carroll and Harry D. Nims, both of New York City, of counsel), for appellee.

Before LACOMBE, WARD, and NOYES, Circuit Judges.

PER CURIAM. Taken as a whole, we fully approve Judge Hand's opinion and upon it affirm the decree appealed from. In so doing, however, we must not be regarded as assenting to the proposition that the name "Webster's Dictionary" has a technical or secondary meaning as indicating a publication of the complainant. And, on the other hand, we must not be considered as indicating an opinion that cases cannot be presented showing unfair competition in the sale of books or as passing upon the relief which may be granted in cases of fraud.

The decree of the District Court is affirmed, with costs.