# CASES

## ARGUED AND DETERMINED

IN THE

# UNITED STATES CIRCUIT COURTS OF APPEALS AND THE DISTRICT COURTS

---

SAALFIELD PUB. CO. et al. v. G. & C. MERRIAM CO.

G. & C. MERRIAM CO. v. SAALFIELD PUB. CO. et al.

(Circuit Court of Appeals, Sixth Circuit. January 13, 1917.)

Nos. 2855, 2856.

1. COURTS &⪰406(1)—APPEAL—WAIVER OF ERRORS—FAILURE TO ARGUE.
   Errors assigned but not insisted upon nor argued, as required by Court Rule 20 (202 Fed. xiv, 118 C. C. A. xiv), are treated as waived.

   [Ed. Note.—For other cases, see Courts, Cent. Dig. § 1103; Dec. Dig. &⪰406(1).]

2. APPEAL AND ERROR &⪰1201(6)—PROCEEDINGS AFTER APPEAL—CHANGE OF THEORY.
   Where the original bill for injunction against unfair competition was framed, and the case was tried, and an appeal determined, on the theory that certain dictionaries published by defendants were revisions of a dictionary the copyright of which plaintiff had owned before its expiration, plaintiff could not, after a decree permitting the use of the title to the copyrighted dictionary under certain restrictions, and after more than four years of litigation, change the theory of the case by alleging that defendants' dictionaries were in fact revisions of a different dictionary so as to show fraud in the use of the title of plaintiff's dictionary.

   [Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. § 4683; Dec. Dig. &⪰1201(6).]

3. APPEAL AND ERROR &⪰1099(3)—EFFECT OF DECISION—PERMISSION TO AMEND.
   Permission granted by the appellate court to file in the court below a supplemental bill does not bind the court as to the validity of the new claims sought thereby to be presented.

   [Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. § 4372; Dec. Dig. &⪰1099(3).]

4. TRADE-MARKS AND TRADE-NAMES &⪰70(3)—UNFAIR COMPETITION—TITLE OF BOOK.
   Where plaintiff, who had succeeded to the rights of the author of Webster's dictionary, the copyright to which had expired, had published for several years a smaller dictionary which it called Webster's Collegiate Dictionary, and which had a large sale among the class of purchasers for whom it was intended, a publication by defendants of a dictionary known as Webster's Intercollegiate Dictionary, which was similar in size and style and intended for the same class of purchasers, was unfair com-

---

&⪰For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

238 F.—1

petition which can be restrained, though plaintiff had lost its exclusive right to the use of the title Webster's Dictionary.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 81; Dec. Dig. &#x25CE;&rarr;70(3).]

5. TRADE-MARKS AND TRADE-NAMES &#x25CE;&rarr;3(3)—RIGHT TO TRADE-MARK—DE-SCRIPTIVE WORD—SECONDARY MEANING.

It is not essential to the right to the exclusive use of a descriptive word in a trade-mark, on the theory that it had acquired a secondary meaning as designating a particular product, that the personal identity of the maker of that product should be known.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 6; Dec. Dig. &#x25CE;&rarr;3(3).]

6. TRADE-MARKS AND TRADE-NAMES &#x25CE;&rarr;85(1)—RIGHT TO TRADE-MARK—DE-SCRIPTIVE WORD.

Where the original title of a dictionary had been used by plaintiff, who had the right to publish it, to designate numerous subsequent editions and revisions, so that, notwithstanding the expiration of the original copyright, the title had acquired a secondary meaning as designating the series of dictionaries published by plaintiff, the fact that the latest of those dictionaries bore little resemblance to the original does not establish such deception as will deprive plaintiff of his right to protection in the use of the descriptive word.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 94; Dec. Dig. &#x25CE;&rarr;85(1).]

7. TRADE-MARKS AND TRADE-NAMES &#x25CE;&rarr;97 — INFRINGEMENT — DESCRIPTIVE WORD—DISTINGUISHING NOTICE.

Where a descriptive word has acquired a secondary meaning as designating plaintiff's product, and the use of defendant's name on his product bearing the same descriptive word will distinguish it, that is sufficient; but, where the use of his name will not sufficiently distinguish the product as defendant's, he can be required to use a notice indicating that it is not plaintiff's product.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. §§ 110, 111; Dec. Dig. &#x25CE;&rarr;97.]

8. TRADE-MARKS AND TRADE-NAMES &#x25CE;&rarr;97—DESCRIPTIVE WORD—SECONDARY MEANING—NOTICE.

Though the title of a dictionary, the copyright on which had expired, had acquired a secondary meaning as designating the series of diction-aries published by plaintiff, one reprinting the original dictionary after the expiration of the copyright, and long after plaintiff had ceased publishing and selling that edition, need only insert his name as publisher on the title page; but where defendant publishes a dictionary departing from the original as much as plaintiff's latest dictionary, which had acquired an extensive reputation of its own, and resembling the latter in appearance, defendant can be compelled to use a notice that its dictionary is not published by the original publishers, or their successors.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. §§ 110, 111; Dec. Dig. &#x25CE;&rarr;97.]

9. TRADE-MARKS AND TRADE-NAMES &#x25CE;&rarr;97—INFRINGEMENT—NOTICE—PLACE OF PUBLICATION.

Where a descriptive word has acquired a secondary meaning as designating a series of dictionaries published by plaintiff, defendant can be compelled to publish a notice of its dictionaries designated by that word, not only on the title page, but wherever as on the cover back, front

---

&#x25CE;&rarr;For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

cover, or in its advertisements, it uses the descriptive word in connection with the designation of its dictionary. ,

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. §§ 110, 111; Dec. Dig. ☞97.]

10. TRADE-MARKS AND TRADE-NAMES ☞97—INFRINGEMENT—DECREE—COMPLIANCE.

A decree requiring defendant to publish such notice in connection with the descriptive name is sufficiently complied with, where the notice is published on the cover back and at the top of the title page, though the notice on the title page is not particularly prominent and there was no similar notice on the front cover, where, however, the descriptive word was not used. ,

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. §§ 110, 111; Dec. Dig. ☞97.]

Appeals from the District Court of the United States for the Eastern Division of the Northern District of Ohio; John H. Clarke, Judge. ·

Suit by the G. & C. Merriam Company against the Saalfield Publishing Company and another for an injunction to restrain defendants from using the same name in the title of their dictionaries as was used by plaintiff. From a decree permitting the use of the name under certain restrictions, both parties appeal. Modified and affirmed.

No. 2855:

Wade H. Ellis and Challen B. Ellis, both of Washington, D. C., for appellants.

Wm. B. Hale, of New York City, for appellee.

No. 2856:

Wm. B. Hale, of New York City, for appellant.

Wade H. Ellis and Challen B. Ellis, both of Washington, D. C., for appellees.

Before WARRINGTON, KNAPPEN, and DENISON, Circuit Judges.

DENISON, Circuit Judge. These are, respectively, appeal and cross-appeal from the decree of the District Court, entered in purported compliance with our mandate on the former appeal. 190 Fed. 927, 111 C. C. A. 517, and 198 Fed. 369, 117 C. C. A. 245. By our second opinion, certain details, both as to the form of the injunction and as to the accounting liability, were committed to the trial court for decision. In the court below there was then a reference to a master, who made findings of fact bearing upon these special questions so reserved, as well as upon the amount of the profits or damages to be paid. Exceptions to the master's report embodying these findings were overruled and the findings confirmed. The controversy as to profits and damages was compromised and settled, but a decree determining the precise scope of the injunction was entered, against the objection of plaintiff that it did not go far enough, and the protest of defendants that it went too far.

[1] Upon these appeals the plaintiff urges only the two points hereafter discussed, and the defendants, although assigning a large number

of errors, have insisted upon and argued only one general proposition. All other errors assigned are therefore to be treated as waived. Rule 20 (202 Fed. xiv, 118 C. C. A. xiv); Ironton v. Harrison (C. C. A. 6) 212 Fed. 353, 357, 129 C. C. A. 29; Gibson v. Ry. (C. C. A. 6) 215 Fed. 24, 27, 131 C. C. A. 332.

[2] 1. The complaint prosecuted in the First circuit was against the single form of dictionary then published by Ogilvie, which was of the exhaustive or unabridged class, and was called "Webster's Imperial" or "Webster's Universal." After the purchase of Ogilvie's business by the defendants here, and before the filing of this bill, they had published three other dictionaries of abridged type, which they called, respectively, "Webster's Intercollegiate," "Webster's Adequate," and "Webster's Sterling." The bill in this case complained also of these three small dictionaries, and grouped them with the "Imperial." Our opinion and the decree of the court below, pursuant to the mandate, adopted this classification and awarded against them the same relief as given against the Imperial. Pending the accounting below, the plaintiff applied to this court for leave to file in the court below a supplemental bill, resting upon the theory that these three small dictionaries were not, in truth, revisions of the original, copyright-expired Webster, but were mere reprints of an English dictionary, the "Twentieth Century." We gave this permission, the bill was filed, and the master, by his confirmed report, found the facts to be in accordance with the plaintiff's claim. Upon this basis plaintiff now urges that defendants should not be allowed to use the name "Webster" as to these dictionaries at all, because they are not Webster's dictionaries; that the foundation of the modified right to use the word awarded to the defendants as to the Imperial was the fact of sufficient identity between the Imperial and the 1847 copyrighted book; and that, with this support removed, nothing remains save the fraud accomplished by using the name to deceive the public which is familiar with that secondary meaning of "Webster's," indicating plaintiff's publications—the result stated by Judge Dallas, in Singer v. Hipple (C. C.) 109 Fed. 152, where he says:

"Consequently the defendant's employment of the word * * * can have but one result, and that is not to correctly identify the thing itself, but to mislead the public as to its source."

We are satisfied to dispose of the error alleged in this respect without examining the sufficiency of the argument just stated. Plaintiff's effort to reshape the litigation as to these three small dictionaries is belated. No satisfactory reason appears why the fact that these dictionaries are so nearly identical with the "Twentieth Century" and so far removed from the 1847 Webster's was not observed long before. With ample opportunity for knowing this fact, plaintiff was satisfied to file this bill, resting on the inconsistent theory that these dictionaries were like the Imperial, which had been adjudged to be a revision of the 1847 Webster's, and to prosecute the case on that theory through our courts for four years. The new theory is so obviously an afterthought, designed to overcome the partially disappointing construction which we gave to the decree in the First circuit, that only an extraordinary

case of thwarted diligence in making an earlier discovery and of sharp injustice otherwise resulting would justify upsetting the formerly accepted basis of litigation. Applying this principle, and without going further, the decree below in this respect should be affirmed.

[3] It is quite obvious that our mere permission to file a supplemental bill in the court below did not, in any way, commit us or bind that court as to the rightfulness of the new claims sought to be presented.

[4] 2. A distinct question exists as to one small dictionary published by defendants, "Webster's Intercollegiate." The original bill in this circuit asked an absolute prohibition of the use of this composite name, as being a manifestly fraudulent imitation of the long-established name of one of plaintiff's publications, "Webster's Collegiate Dictionary." The issue made on this point is one of the things expressly reserved in our former opinion; and, upon this issue, the master found and reported:

"That the name 'Intercollegiate' was adopted by defendants as a name for this dictionary, with the intention of using it to mislead and deceive purchasers. I find therefore the name 'Intercollegiate,' as used by defendants, is, of itself, a violation of complainant's rights."

Upon exceptions, this finding was confirmed; but, in the final decree, completely formulating the injunction, this subject was not mentioned.

Not only would we be strongly inclined to accept the concurrent finding of the master and the district judge, but we think they were right. "Webster's Collegiate Dictionary" was published under that name by the Merriam Company, in 1898. In its special field it became well known and largely used. The defendants' "Webster's Intercollegiate Dictionary" was published in 1907. It was of the same general size, form, and style, and intended for the same class of purchasers. It is true enough that "Collegiate" is inherently descriptive; but whatever doubts there might be about the propriety of attributing a secondary meaning to "Webster's Dictionary" alone cannot extend to the collocation of the three words, "Webster's Collegiate Dictionary." It is the natural inference, as it is the finding of the master, that during the period of nine or ten years this phrase would come to be taken as referring to the Merriam book. It was the only one of that name, and it was one upon which—though this is probably not important—the copyright had not expired; and it is a fair assumption that defendants could have only one purpose in rejecting the many names appropriate for a book of this particular size and utility and adopting the one which so clearly would produce an impression that it was the well-known book of almost identical name. Such difference as there is between "Collegiate" and "Intercollegiate" only indicates the desire to vary without distinguishing. We think the injunction should forbid the defendants from using the title "Webster's Intercollegiate Dictionary" upon or in connection with any book of the general class of the Merriam "Webster's Collegiate Dictionary."

3. The defendants' appeal is based on the position that they performed their full duty by printing their names in the ordinary manner

upon the title page of their book as its publishers, and that they ought not to be required to employ any notice affirmatively calling attention to the fact that their book is not the Merriam book. Since it was expressly adjudged in the suit in the First circuit that this very notice must be used, and we have held that all things covered by that judgment are res judicata in this suit, and since, by our two previous opinions, the notice has been required in this case, we might well pass this subject (as to the Imperial) without further discussion, although our power to reach a different conclusion at this time may be conceded. Chesapeake, etc., Co. v. McKell (C. C. A. 6) 209 Fed. 514, 516, 126 C. C. A. 336. However, defendants' present counsel have elaborately argued the meritorious question, relying especially upon recent decisions adverse to the Merriam Company (Merriam Co. v. Syndicate Co. [D. C. and C. C. A. 2] 207 Fed. 515, 125 C. C. A. 177; Id., 237 U. S. 618, 35 Sup. Ct. 708, 59 L. Ed. 1148); and we think proper to consider it somewhat further.

We reached the conclusion (198 Fed. 375, 117 C. C. A. 245) that the decree in the First circuit rests at last on the theory that the name "Webster's Dictionary" not only had its primary meaning of reference to the edition of 1847, upon which the copyright had expired in 1889, and to earlier ones, but that, as early as 1904, when defendants' publication began, the term had acquired a secondary meaning as indicating the line of dictionaries then published by the Merriam Company. The tenability of this theory has been doubted; and, although the requirements of the present situation are fully met when we again find, as we must, that this is the theory which was adopted in the First circuit as the basis of the decree there rendered, and which decree we are, in this suit, enforcing—only with such constructions as the additional facts make necessary—yet we are by no means satisfied that the theory is wrong in fact or in law. There are certain undisputed facts as well as inferences therefrom which have not been mentioned in the later decisions, and which, possibly, have escaped consideration—as indeed they did in our opinion in 198 Fed.

This First circuit litigation did not pertain, nor does this—except in rather a negligible degree, if at all—to that particular book upon which the copyright expired in 1889. There is much force in the thought that a publisher who has enjoyed the monopoly of a book during a copyrighted period, and who, for that reason alone, is directly reached when the public thinks of the book, ought not to be allowed to prolong his monopoly in the same thing by immediate resort to the secondary meaning theory; but although the exact reproduction of the edition of 1847 is covered by the language of both decrees, there and here, it is not the substantial thing in controversy. That edition disappeared from the market in 1864, or immediately thereafter, and for the next 25 years the revision of 1864 and its modifications exclusively held the field. This was followed by the revision of 1890, the "International." These revisions of 1864 and 1890 produced books very different in general form and appearance from the edition of 1847. They —and especially that of 1890—compared with the 1847 edition as an adult with a child. The defendants' 1904 Imperial (or Universal) Dic-

tionary was of the same class as the Merriam 1890 revision; it was intended to compete with that revision, and not with that of 1847; no one bought the defendants' Imperial supposing that he was buying a Merriam 1847; one sold for $6 or $8, the other for $1 or less; the misleading and deception of the public, which has been found as a fact by a decree to which the defendants are privies, was with reference to the actual competitive dictionaries and with reference to that type and style of Webster's Dictionary which—alone' of that type—had been on the market under that name for 14 years. The Merriam Company was not seeking to protect itself against unfair competition and the public against misleading in the matter of a book upon which the copyright had expired, but in the matter of a book—the revision of 1890—to which the Merriam Company had a rightful monopoly. The simulation of size, shape, general appearance, title, title page, etc., of which defendants were found guilty, all related to and constituted unfair competition against the Merriam "Webster's International." This is confirmed by the fact, already mentioned, that the copyrighted book of 1847 was withdrawn from the market in 1864 and never again was put on sale, until this was done by others than the Merriams in 1890; and is further confirmed by the fact that "Webster's Dictionary" was not the registered copyrighted title of the 1847 book, as seems to have been taken for granted, nor was it ever the registered title of any other book, the copyright upon which has expired. The edition of 1847 was itself published after the death of Dr. Webster, and was based upon earlier editions, the first of which was published in 1806 and the copyright upon which expired in 1834. It is an entire mistake to suppose that "Webster's Dictionary" was a copyrighted title which first became free to public use in 1889; so far as concerns any copyright upon these words themselves, they have always been just as free to the public as they are now.[1] The registered title of the 1847 edition, as of that of 1828, was "American Dictionary," and it was called, as its predecessors since 1806 had been called, "Webster's Dictionary" only because that was an appropriate and descriptive name of the thing. If it be said that freedom to use the title was unavailing while the book was covered by copyright, the reply is that the copyright upon the original "Webster's Dictionary" expired in 1834, and ever since that date any one has had a right to publish that book, or his own revision of it, and call his publication "Webster's Dictionary." Up to the beginning of this suit no one had done so, if we except defendants. The right to publish editions after that of 1806, and copyrighted by Dr. Webster in his lifetime or by his executors shortly after his death, remained outstanding in different publishers until the last such right was purchased by the Merriams in 1858. How long, if at all, any of these editions continued to be actually published after 1847 under the name "Webster's Dictionary," is not clear; but certain it is that from

---

[1] The right of a publisher to restrain others from using the title of his book or magazine is independent of any copyright law, and sufficiently rests upon the law of trade-marks or unfair competition. Estes v. Worthington (C. C.) 31 Fed. 154; Gannert v. Rupert (C. C. A. 2), 127 Fed. 962, 62 C. C. A. 594; Corbett v. Purdy (C. C.) 80 Fed. 901.

1858 until 1890, no one, except the Merriams or their licensees, used the title in question, although, as above stated, the public was free to do so.[2] After 1890, and until 1904, if there was any use of the title by others, except in connection with mere reprinting of the 1847 edition (or with additions from the edition of 1859), it has not been pointed out to us.

Even if it should be said that the edition of 1806, although unabridged, was such a different type of book that the expiration of the copyright in 1834 did not leave the public at liberty to use the name upon the book of an unabridged type, like defendants' Imperial, it must be seen that the 1828 revision was of the same class as that of 1847, and the defendants' book, the Imperial, is presumably related to that edition in the same way that it is to the 1847 edition, except, perhaps, in less degree. This 1828 copyright expired in 1870, so that, if we confine ourselves to a book of this specific class, we find that when defendants entered the field, the public had possessed full right to publish such a book under that name for 34 years, but had acquiesced in the exclusive occupancy of the field by the Merriams.

So far as our opinion in 198 Fed. assumed that there had been a period of only 15 years before defendants' appearance, in which a new and qualified right might be accruing to plaintiff on the secondary meaning theory, we overlooked the fact that the public right in this respect had been perfect ever since 1834, and that the bill of complaint did not plant plaintiff's right solely upon the short recent period of use after the 1847 copyright expired, but rather upon the continued use ever since 1864 when the 1847 edition was withdrawn from the market.

These considerations tend to persuade that the life or death of the copyright monopoly in the contents of the book does not necessarily control the right to use the name by which the book was known, but that, when protection is sought against unfair competition with books which plaintiff has the sole right to publish, the case for the secondary meaning theory stands on the same basis as with regard to any other descriptive word.

[5] It is not of controlling importance to the true application of the secondary meaning theory that the public should appreciate the personal identity of the manufacturer. The deception involved in every such case, as in a trade-mark case, is said to be a deception as to the origin of the goods; but this is a formula for expressing the ultimate result. With reference to articles which have trade-names, it is the article itself and its good qualities which the public appreciates and which cause it to desire to get the genuine article made by the manufacturer who has established its reputation, rather than something made by some one else. Particularly under present-day conditions, the purchasing public may have a fixed purpose to buy a given article and not a sub-

---

[2] There have been large sales of some of the smaller forms by the American Book Company and by Ivison, Blakeman, Taylor & Co., but these were printed under the Merriam copyrights of date later than that of 1847, and from the Merriam plates; they carried the Merriam name on the title page and the Merriam copyright marks; and they were, in substance, published by the Merriams in partnership with the others named. They do not negative public acquiescence in an assumption of exclusive right.

stitute therefor, and yet be quite ignorant whether the genuine article is made by one or another manufacturer. Even under earlier conditions, the purchaser of "Stone Ale" or "Camels' Hair Belting" or "Glenfield Starch" very likely knew as little as he cared about the personal identity of the maker.[3]

[6] Nor, if it is true, is it inconsistent with recognition of the secondary meaning of "Webster's Dictionary" in this case, that, in the now competitive books, the plaintiff departs as far as defendants do from the 1847 edition. The bearing of this proposition upon the other proposition—that in 1904 "Webster's Dictionary" had come to mean, prima facie, the Merriam editions—is not obvious. If the case were confined to the right to reproduce the 1847 edition precisely, the question would be different; but that same latitude of construction which enabled the defendants partly to escape the charge of fraud in the use of the name and to convince the courts in the First circuit that the defendants' dictionary contained enough of the 1847 edition to justify using the title which had become the common name of that book, extends, also, to the protection of plaintiff and acquits it of defrauding or deceiving the public by continuing to call its books by that name. Plaintiff's conduct is also characterized, not by the use of the title as the name of one particular book, but by the consistent use of the name for its series of books for 60 years before this litigation began, covering three general revisions and very numerous editions of the large book, and covering a great variety of abridgements and including sales of over 10,000,000 copies of the different forms, after the 1847 edition was withdrawn. "Webster's Dictionary" never was the name of the 1847 book and of that alone so exclusively that for that sole reason it became inherently fraudulent to call by that name any other edition or revision. From 1847 to 1864, the five editions, published from 1806 to 1840, were doubtless in circulation, though they did not continue to be published (unless, perhaps, to some extent, until 1858). From 1864 to 1890 the name was rightly applied to the edition of 1847 and to that of 1864, and from 1890 to 1904 it properly designated at least three editions. It cannot be said that the use of this term by the Merriams in 1904 tended to deceive the public into thinking that the book the

---

[3] Where an article is put out under a trade-name which, although it must be called descriptive, is yet also something more than merely descriptive, and where the public is free to compete in the same article and in the same name, but for a long period refrains from both, this seems to the writer the ideal soil in which the secondary meaning may grow into effective existence. The name points to one maker only, without confusion or uncertainty, and it is a sure "badge of origin." One of the opinions in the Cellular Clothing Case, [1899] Appeal Cases, pp. 326, 343, cited with some approval in the Malted Milk Case, 85 L. J. R. 338, and by this court in Kellogg Co. v. Quaker Co., 235 Fed. 657, 666, —— C. C. A. ——, disparages the effect of that use which is associated with noncompetitive goods. In the Kellogg Case, at least, the words in question were so far the obviously apt words for concise description as to require the strongest case of deliberate acquiescence in exclusive appropriation in order to maintain the theory of secondary meaning, and in such a case the strictest rule may well be applied. In the present case, adopting defendants' definition of "Webster's Dictionary," there has long been competition in the article itself, and even the rule of the Cellular Case would not reach it.

Merriam Company was then publishing was the edition of 1847 or that of 1864; and unless this use of the term by the Merriams, in 1904, when defendants came on the field, was deceptive, then the Merriams were entitled to the full benefit of the secondary meaning, as far as the facts may otherwise justify.

We are not considering this question as an original one, nor undertaking its decision. We have so far reviewed it only to be satisfied that the decision in the First circuit was not so obviously wrong or unjust that we should confine the enforcement of that decree most strictly and not allow its operation beyond its very letter. After such review, we see no reason to doubt that the decree in the First circuit against the "Imperial" stands as the ordinary one against a defendant who has used a trade-name which, though descriptive, has, by long acquiescence, come to be identified only with plaintiff's product, and which therefore, on well-settled principles, the defendant may use only if he effectively distinguishes, nor to doubt that we should enforce the decree in the First circuit according to its fair meaning and effect, as being an application of this principle.

[7] This brings us directly to the contention regarding the special notice prescribed by the former decree, "This dictionary is not published by the original publishers of Webster's Dictionary, or by their successors." It is urged that such a notice unfairly disparages defendants' books and imposes a greater burden than the law justifies. It is said that the Singer Case required only that the article should be marked with the name of the defendant as manufacturer, and that all other cases in the Supreme Court, like the Hall Case and the Waterman Case, in which a "not made by" notice has been required or sanctioned, were cases involving the use of a personal name, and reaching directly instead of indirectly the personal identity of the manufacturer. In the Hall Case and in the Waterman Case the plaintiff and defendant had the same name, and marking the article with the name of the defendant as manufacturer would not distinguish, but would become a mark of confusion and misleading instead of a mark of differentiation; and it is clear that, in such cases, the defendant must positively distinguish by something beyond his own name. The cases below the Supreme Court, where such notices have been required, are very numerous. Some of them can be justified upon the ground that the use of defendant's name alone was itself misleading; others, like Jenkins v. Kelly (C. C. A. 3) 227 Fed. 211, 142 C. C. A. 11, and Ludlow v. Pittsburgh (C. C. A. 3) 166 Fed. 26, 92 C. C. A. 60, are quite inconsistent with any such distinction and stand upon broad grounds which would require a negative notice in all the secondary meaning cases. It may be true that in the Singer Case no such notice was compelled,[4] but it is to be observed, first, that the propriety of such requirement was not

[4] In the June Case, 163 U. S. 169, 204, 16 Sup. Ct. 1002, 41 L. Ed. 118, the order required the notice to show that the article was "made by defendant, as distinguished from" plaintiff, or was "the product of defendant, and therefore not the product of" the plaintiff; but in the companion case (Singer Mfg. Co. v. Bent, 163 U. S. 205, 207, 16 Sup. Ct. 1016, 41 L. Ed. 131) the order required notice that the machine was "the product of the defendant and not the manufacture of" the plaintiff.

considered, and the case arose before the later common practice on that subject had grown up; and, second, that the case may well be classified as one involving direct deception concerning the identity of the manufacturer rather than mere misleading as to the identity of the article. So far as there is a distinction between these two things, the Singer Case is near the line. It may well be that the Supreme Court would have deliberately held that to' mark the machine labeled "Improved Singer" with the name of the June Company as maker would sufficiently distinguish, and yet it may also well be that if the Singer machine had become known on the market by some other name, even a descriptive one, e. g., "Perfection," and the June Company had used the same name, "Perfection," the Supreme Court would have required it to say, "This machine is not made by the makers of the original 'Perfection,' nor by their successors."

If, then, we assume that, where the plaintiff's "secondary meaning" mark is his own name, and defendant is entitled to use that same name, the defendant must negatively distinguish, and that where plaintiff's mark is of the same character, but defendant's name is wholly different, the use of defendant's name will be a sufficient distinction, it is clear that the cases where plaintiff's mark consists in a descriptive word must fall into one or the other class according to the circumstances of each case. Sometimes defendant's name will sufficiently distinguish; at other times, and perhaps generally, it will not, but will even aggravate the misleading, as in Menendez v. Holt, 128 U. S. 514, 521, 9 Sup. Ct. 143, 32 L. Ed. 526, and in Jacobs v. Beecham, 221 U. S. 263, 272, 31 Sup. Ct. 555, 55 L. Ed. 729. The present case is not of the class directly reaching personal identity like the Hall Case; it is distinctly of the descriptive word class, and, while it has been said that the name had come to indicate that a book called thereby was published by the Merriams, this is largely true only in an indirect way. It had come to mean that the book was one of the regular series then being published by the house which alone, for at least 50 years, had been publishing current revisions called by that name; but what the name of that house might be would be known only to a part of the public that received the broader impression.

[8] When we apply these principles to defendants' books, we are compelled to think there is a vital distinction between the mere reprinting of the edition of 1847 and the putting out of the other books which were competitive with the various forms of Merriam books being published in 1904. This results not only from the fact that the Merriams had withdrawn this 1847 edition from the market in 1864, and that there could not very well be unfair competition in an article which plaintiff was not selling in 1890 when these reprints first appeared, but also from the logical difficulty of predicating unfair competition upon the mere reproduction of a book on which the copyright has expired, if that reproduction by others begins, as here, promptly on the expiration of the copyright, and is continued by one or another of the public until the defendant appears. A reputation for good paper, durable binding, good press work, etc., might constitute a basis upon which the public could intelligently wish to buy from the original

publishers and not from others; but nothing of the kind is alleged here. The case against the defendants, in this particular, stands solely upon a photographic reproduction of the 1847 book; a reproduction perfect in every detail, save for the substitution of defendants' name on the title page as publisher and save for an appendix. Upon this foundation only there is scant room to support the theory of misleading the public. The public gets the precise article indicated by the name, and—lacking any question as to the quality of the publishers' work—the general public will be rightly indifferent as to who the publishers may be. It follows that, in our judgment, the notice should not be required on the reprints of the 1847 book; the defendants' name on the title page, as publisher, is a sufficient distinction; and, though the letter of the decree in the First circuit is broad enough to cover this specific matter, we see no reason to think it was so intended. It is apparent from all the opinions in that circuit, as it is from our own two former opinions, that the only subject-matter actually considered was the alleged unfair competition involved in the attempts by defendants to sell defendants' series of revised dictionaries as against the series which the Merriam Company was publishing and selling in 1904. Whatever is said in those opinions regarding the rightful standing of the secondary meaning theory has reference to this state of facts.

Different considerations govern the Imperial (or Universal). This was put out to compete with plaintiff's International which (with its variations) had been the only Webster's Dictionary of this class, in quarto form and unabridged, upon the market for fourteen years. It had been produced by plaintiff at great expense, and it had very high reputation for its literary merit, distinct from and beyond anything contained in former revisions. As applied to this subject-matter—the only substantial thing there involved—we interpret the judgment of the First circuit as a finding that the portion of the public which constituted prospective purchasers for that class of dictionary had come to understand that "Webster's Dictionary" meant Webster's International, published by the Merriams, and desired to buy that book, and was liable to be deceived if it was offered anything else, superficially similar, dressed with the same distinguishing name—even though it would not know the difference between the Merriams and Ogilvie as publishers, or get any effective warning by seeing Ogilvie's name on the title page. From this point of view the case is the typical one where the special notice is necessary, to the same extent and for the same reasons as in the Hall and Waterman Cases.

The same reasons which justify the notice upon the Imperial (or Universal) apply to the smaller dictionaries. For a long period before the defendants put these out, the special class of dictionary users, to whom they appeal, had been familiar with the several abridgements of the same class published by plaintiff and called "Webster's Collegiate," "Webster's High School," etc. The value of these books depended upon their reputation for the skill with which they had been prepared for their intended use; and, by giving to their own books the name by which the others were known, the defendants appropriated a part of the reputation of plaintiff's books. The periods of ex-

clusive use of the name after the name was free to the public, etc., will be different with respect to the abridgements and with respect to the unabridged; but we see no substantial distinction in the right of the matter.

[9] 4. Included in defendants' main contention is the subordinate one that, if the specific notice is to be used at all, its presence on the title page is sufficient, and it ought not be to required, as by the decree below it is, in every place where the defendant displays the name "Webster's Dictionary." This has special reference to the back of the book and the outside front cover of the book, in each of which places this name was conspicuously stamped, and to advertisements. This subject, also, was reserved by our former opinion, and we thought that, though the decree in the First circuit did not specifically reach to these details, it had general language that we might so read. As to all these competitive books, we may take plaintiff's "Webster's International" and defendants' "Webster's Imperial" as typical. The adjudicated reason why defendants may not use the name without any limitation is that its unrestricted use tends to make the purchaser think he is geting the Webster's International with which he had been familiar for 14 years. This false impression will be produced by the cover or advertisements as well as by the title page; indeed, the careless and hasty purchaser—for whose aid decrees of the kind are mainly necessary—is more apt to be misled by the cover or by advertising than by the title page. If the presence of such a notice on the outside back or cover is an intolerable burden, the remedy is in defendants' hands. The burden exists only because defendants are trying to mislead as to what the book is; and if there is any motive leading them to insist upon prominently displaying the name "Webster's" on their Imperial dictionary, except the desire to sell to purchasers familiar with the superficially almost identical Webster's International, that motive has not been pointed out.[5]

We find in Merriam v. Syndicate, 237 U. S. 618, 35 Sup. Ct. 708, 59 L. Ed. 1148, nothing inconsistent with these considerations. It is there held that "Webster's Dictionary" was so descriptive a term that it could not be registered as a trade-mark under the law of 1881; whether it could be registered under the law of 1905 by virtue of an acquired secondary meaning was held to be a question not within the appellate jurisdiction of the Supreme Court. It is not to be supposed that the Supreme Court intended to decide indirectly the very question it refused to consider.

[10] Upon the oral argument, plaintiff's counsel produced what appeared to be one of defendants' Imperial dictionaries, bearing the copyright mark of 1914 and the imprint of 1915. We think it is in compliance with the decree. It carriers the notice upon the back; there

---

[5] The Century and the Standard, though "Wester's Dictionaries" (defendant's brief), have not found it necessary to take that name. The Imperial Dictionary was first published by Dr. Ogilvie, and claiming to be a revision of Webster's 1847, in 1859. Forty-five years later, the defendant Ogilvie's revision, no more but rather less "Webster's" than the Imperial always had been, became "Webster's Imperial."

is none upon the front cover, but the word "Webster's" does not there appear; and, while the notice on the title page is not overprominent, yet it is not confused with the body of the title page, but is at the top, and, aided as it is by the notice on the cover back, it is sufficient.

It results that the decree below will be modified by extending the injunction so as absolutely to prohibit on defendants' books the name "Webster's Intercollegiate" or any other name so similar to "Webster's Collegiate" as to tend to deceive the public concerning the identity of the book, and by narrowing the injunction so as wholly to exempt from its operation any mere reprint of the 1847 edition which bears the name of the defendants on the title page as publisher in the usual form; and the decree in all other respects will be affirmed. No costs will be awarded in this court, on either appeal.

⟨⟩For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes