HARVEY HUBBELL, Inc., v. GENERAL ELECTRIC CO. et al.

(District Court, S. D. New York. October 20, 1919.)

No. 265.

1. TRADE-MARKS AND TRADE-NAMES ⬤═67—MAKING UNPATENTED PARTS INTERCHANGEABLE NOT UNLAWFUL COMPETITION.

Complainant, a large manufacturer of electrical contact devices, in the absence of protection by patent or trade-mark, held not to have acquired an exclusive right in the arbitrarily selected size and shape of the parts of its devices, which precluded other manufacturers from openly adopting such size and shape for the purpose of standardizing and making the parts interchangeable with those of each other and of complainant.

2. TRADE-MARKS AND TRADE-NAMES ⬤═93 (3)—EVIDENCE INSUFFICIENT TO SHOW UNFAIR COMPETITION.

Allegations of unfair competition, by copying the physical characteristics of complainant's devices, held not sustained by the proofs.

In Equity. Suit by Harvey Hubbell, Incorporated, against the General Electric Company and others. Decree for defendants.

W. Clyde Jones, of Chicago, Ill., and Everett N. Curtis and Clifton V. Edwards, both of New York City, for plaintiff.

Frederick P. Fish, Samuel Owen Edmonds, and Hubert Howson, all of New York City, for defendants.

MANTON, Circuit Judge. This bill in equity seeks relief for an alleged invasion of property rights and unfair competition in trade, said to result from the manufacture and sale by some of the defendants named of separable attachment plugs and receptacles. It is claimed that some plugs and receptacles, sold by some of the defendants named, correspond in make and fit with devices produced by the plaintiff.

Two causes of action are alleged in the pleadings and were urged upon the trial:

First. That the plaintiff, by its energy, industry, and expenditure of large sums of money throughout a period of 10 years prior to the filing of the bill, established and built up a system of doing business, constituting a service to its customers, which resulted in good will and business, and the plaintiff now claims that, thus creating a system of service, it has a property right which a court of equity should protect from the invasion of other manufacturers.

Second. That the defendants have copied the distinctive appearances of plaintiff's goods, and have placed them upon the market in such a way and by such devices as are calculated to deceive innocent purchasers, and that by reason thereof they are guilty of unfair trade.

⬤═For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

[1] As to the first cause of action, the plaintiff contends that the defendants the General Electric Company and the Bryant Electric Company, and some selling agents named as defendants, have united in a plan of action or scheme to appropriate the Hubbell system, so-called, in violation of the plaintiff's property rights, and that the defendants have entered the market in competition with the plaintiff with a series of devices, plugs, and receptacles, so constructing them as to use the arbitrary dimensions of the interfitting parts, as to interfit and interchange with the plaintiff's devices, thereby interfering with its system and property right, said to be secured to it, with the result that there has been diverted from the plaintiff recurring sales to which it is entitled as a result of the good will and business it has established.

The defendants present the issue by a denial of the existence of such a right as claimed, and further urge that there is no such similarity of construction or of the method of carrying on their business as to warrant the claim of unfair trade. The principal controversy is over the use by the defendant General Electric Company, and the other manufacturers, of parallel contact-making members of the same dimensions and spacing as those characterizing the contact-making members produced by the plaintiff. The defendants admit that they have used the same dimensions and spacing as used by the plaintiff, but contend that this was done in a necessity for and an honest effort to standardize these devices for the benefit of the trade and public, and with no intent to cause any unfair trade to the plaintiff. Concededly, the result is that the defendants' devices are interchangeable with plaintiff's line of devices, such, at least, as employ the parallel form of contact.

The first cause of action alleged presents the question: Has the plaintiff such a property right in a system of service which a court of equity should protect?

The General Electric Company produces a line of devices known in the trade as "G. E. Standard;" the Bryan Electric Company produces a line known as the "Spartan;" and, throughout the trial, comparison as to the shape, form, and manufacture was made between plaintiff's line and the lines of these two defendants. Plaintiff has sold to the public millions of these two-part coacting devices, and its line has found its place in hundreds of thousands of apartment houses, office buildings, and living quarters throughout the country. This was accomplished by plaintiff receiving a fair profit for its receptacles, and, as it says, a larger profit for caps which coact with these receptacles. Thus the plaintiff claims it has sustained great damage to its business.

The evidence in the case shows that separable plugs have been known and were in use prior to 1904. The earliest example of this form was the Weston plug, made under the Weston patent, No. 480,900, granted August 16, 1892. It was on the market for a number of years. The terminals on the plug base appear to be the same as the Hubbell plug No. 5915. The cap, to the binding screws of which the conductor is screwed, is separable from the body, thus enabling the body to be screwed into the socket or receptacle and the circuit completed by inserting

the cap in the body by a straight thrust, thus avoiding twisting the conductor.

Another separable plug, put on the market in 1897 and sold since in substantial quantities, illustrates the terminal charactertistics of the Hubbell plug No. 5915, and the sleeve contacts in the Hubbell early plugs. This, too, had a separable cap with coacting contacts.

The General Electric plugs were of the same construction as the Hubbell No. 5915, except that in the latter the pin and sleeve contacts were replaced by a flat and knife blade contacts; and there is sufficient evidence to justify the claim of the defendant that the separable caps and flat knife blade contacts, arranged in parallel relation and receptacles and sockets adapted therefor, were in common use as early as 1886. Of this the Ft. Wayne sockets, receptacles, and plugs were typical. They were manufactured by the Ft. Wayne Jenney Electric Company. It thus appears that separable parts were united by thrusting the knife blade contacts into the locking contact springs of the receptacle, as is done to-day in the case of both the plaintiff's and defendants' devices. The Ft. Wayne devices were superseded by devices having the terminal styles of the screw ring and bottom plate type. Then followed the novelty plug receptacle, where the contacts were of the pin and sleeve type.

In 1903 came the interchangeable plug receptacles. The Bryant Electric Company brought out one having a flush surface receptacle, as illustrated in their catalogue of 1902, at pages 60, 61. This provided for the fitting of the plugs or caps interchangeably into any of the receptacles of the line.

In 1904 Hubbell brought out his separable or detachable caps, thus permitting the cord to be connected to the body without twisting, and permitting an interchange with a line of receptacles; but at this time there were already out for public use, both the pin and sleeve form and the flat knife blade form. The blades were arranged in both tandem relation as well as parallel relation. At this time, undoubtedly, the favorable form was to provide for the connection to be made by thrusting rather than turning. About this time there came into vogue the more frequent use of the electric fan, heating and cooking devices, hair curlers and irons, as well as other devices where electricity was used.

In 1906 the Benjamin Electric Company brought out a small nonseparable swivel plug, which was customarily used. Plaintiff brought out five different types of contacts. Thus the different types of contacts became more diversified, and there was, therefore, no unit of that line interchangeable with a similar unit of any of the complete lines. The plaintiff has established its line of interchangeability, so far as its caps and sockets and receptacles were concerned. The defendant General Electric Company had established its own line, providing for a mechanical interlocking between the male and female contacts, having the contact dependent upon friction, and with the flat knife blade form, such as is illustrated in the Ft. Wayne plug. The Bryant Electric Company brought its line of surface plug receptacles and its Chapman receptacle.

Hubbell adhered to the pin and sleeve form of contact, and provided pins with necks or depressions to effect the locking engagement with

the female contacts, and concealing its female contacts.  Presumably, the insulation of the plug body covered the ends of these contacts, to guard against short circuits.  Hubbell produced the knife blade contacts after 1904, and then employed the blade contacts down to the commencement of this suit.  It changed its contacts from the turning form to the thrusting form.  The plaintiff did this under the protection of its own patents, Nos. 774,250 and 774,251, and also claimed protection under the Weston patent, No. 480,900.  It had a license under the latter patent.  Thereafter the plaintiff placed upon the market a smaller size and less costly plug designed in several types, and in 1912 it brought out its parallel blade cap No. 5915, which is in issue in this case.  This provides parallel arrangement of blades and slots, such as are found in the General Electric plug, "G. E. 062."  The cap of Hubbell's No. 5915 is interchangeable with the cap of "G. E. 062" plug, and fits into the body of the latter with serviceable contact.

In 1914 both tandem bladed caps and parallel bladed caps with receptacles with double contacts, so as to coact with caps of either sort, were brought out.  There was then provided the four-window construction of receptacle, having two tandem slots and two parallel slots.  This, was protected by the Burton patent, No. 1,169,613.  In October, 1914, plaintiff brought out the "double T" or "T-T" form of receptacle.  In 1916 the plaintiff brought out coacting plug caps having blades arranged at right angles.  These would coact with T-T slots, as would the Hubbell tandem blade caps.

In 1915 it is estimated that 85 or 90 per cent. of the business was being done by the plaintiff, the General Electric Company, the Bryant Electric Company, and four other concerns, who were licensees of the General Electric Company and the Bryant Electric Company.  There were other companies in the field doing the balance of the business. There were from 15 to 20 different types of blades, and from 15 to 30 different types of receptacles.  The line of each was not interchangeable with a competing line.  The Hubbell Company was producing and disposing of the larger proportion caps and receptacles.

Then it was that the defendants claim there was public demand for standardization.  Undoubtedly, it was costly to the public to have noninterchangeable plugs, caps, and receptacles.  There was a need for standardization, as is best illustrated by the activities of the International Electric Light Association.  The manufacturers, including the plaintiff, entered into a conference, and discussion was had as to the method of standardization.  Plaintiff rebelled against standardization, using its type of cap and receptacle with the dimensions as, it says, arbitrarily selected by it for the manufacture of its line.  With the plaintiff refusing to standardize, the defendants selected its dimensions and method of contact, and standardized upon the plaintiff's type of blade.

Plaintiff had sold, at this time, approximately 13,000,000 receptacles and plug bases having tandem slots; also approximately 18,000,000 tandem blade caps adapted to coact with those receptacles and bases, and had sold nearly 1,250,000 receptacles and plug bases having parallel slots, and an equal number of parallel blade caps adapted for coaction therewith.  In this it was easily the first (in numbers) in putting

in public use a single type of plug or receptacle. Most of the plaintiff's tandem and parallel devices were in actual use in 1915. For this reason, and because the public had so largely invested in caps and plugs of this type, defendants say that they felt the obligation to standardize upon the Hubbell caps; and the defendants contend that they have adopted a noninfringing construction which the public might use interchangeably with plaintiff's, because they employ the same dimensions and spacing of the contact.

There is no question of infringement of patent involved in this issue. As a result, 85 per cent. of the production of the country is now interchangeable. The defendants' caps and plugs are plainly marked, so that any reasonably intelligent purchaser can easily discern the type of plug he purchases. The marks are plain and unmistakable.

Under these facts, I am of the opinion that plaintiff has no exclusive right to manufacture caps and receptacles of these dimensions and spacing of contacts. Its competitors should have the right to make plugs and receptacles with contacts of any size and shape they desire, even if by so doing it will permit of an interchangeability with the Hubbell line. If the plaintiff had popularized some unnecessary and purely nonfunctional features of its productions, these could not be appropriated without its consent. If it had secured a trade-name, such as "Hubbell's," it could not be appropriated, or if it was protected by valid patents it would be entitled to immunity from infringement. These are not the rights which are here sought to be enforced. The plaintiff asserts a common-law property right, and on what it claims to be the best dimensions for the purpose in the spacing of the contacts.

In Marvel Co. v. Pearl et al., 133 Fed. 160, 66 C. C. A. 226, it was said:

"In the absence of protection by patent, no person can monopolize or appropriate to the exclusion of others elements of mechanical construction which are essential to the successful practical operation of a manufacture, or which primarily serve to promote its efficiency for the purpose to which it is devoted. Unfair competition is not established by proof of similarity in form, dimensions, or general appearance alone. Where such similarity consists in constructions common to or characteristic of the articles in question, and especially where it appears to result from an effort to comply with the physical requirements essential to commercial success, and not to be designed to misrepresent the origin of such articles, the doctrine of unfair competition cannot be successfully invoked to abridge the freedom of trade competition. The enforcement of such a claim would permit unfair appropriation, and deny the exercise of the right of fair competition." 133 Fed. 161, 162, 66 C. C. A. 227.

In Meccano v. John Wanamaker, New York, 250 Fed. 450, 452, 162 C. C. A. 520, 522, Judge Ward, speaking for the Circuit Court of Appeals, said, where a somewhat similar claim to that now advanced by the plaintiff was made:

"The complainant cannot obtain a monopoly for all time of perforated plates of the lengths having equidistant holes and intervening spaces which it first used. These are functional features of the units of construction, which any one is at liberty to use. Of course, it cannot claim a monopoly of constructing the particular models or toys which it has made, as, for example, wheelbarrows, bridges, cranes, Ferris wheels, trucks, etc. Assuming that the public associates plates of this description with the complainant as a source, and

that there is likely to be confusion because of similarity of the outfits, it is a question whether it is entitled, within the decision of the Supreme Court in Singer Co. v. June, 163 U. S. 169, 16 Sup. Ct. 1002, 41 L. Ed. 118, to more protection than that outfits made by others should be advertised and sold as the product of the makers, under names and in packages which do not simulate the complainant's. This is true of the outfits which the defendant sells. The name of the complainant's is 'Meccano,' and of those sold by the defendant 'American Model Builder.' They are advertised as made by the American Mechanical Toy Company, and sold in dissimilar packages. So, in the nature of things, the constructing elements and the things constructed being the same, the plates illustrating them and the instructions contained in the manuals furnished with the two outfits must be more or less alike. All that should be required of other makers is to do independent work."

No court has ever gone to the extent of permitting the establishment of a monopoly of proportions or measurements, in the absence of some patent protection. To do so would be practically to engross the particular business. Distinguishing marks may be adopted to denote the origin of production, or some peculiar method of distinguishing goods, and thus secure the benefit of good reputation which it has acquired from such use or practice. The public have the right to make separable plugs, and, from the nature of the requirements, they must have a resemblance in form, dimensions, and appearance. No one should have the exclusive privilege of selecting measurements, even though arbitrarily selected, and thus establish a particular spacing of the contacts to the exclusion of others. To do so would be to stifle competition.

The plaintiff here does not rest upon the adoption of special characteristics of any kind, but of features which pertain to the article made and sold. Nor is this in conflict with the now well-established rule that, if an article has a leading and striking characteristic, which characteristic is designedly given by its maker, and advertised and exploited, and afterward recognized, particularly by purchasers, because of such characteristic, the right to make and use the characteristic can be protected by an action, if an imitation is perpetrated. This rule finds its support in what is referred to in the cases as nonfunctional unfair competition. It presupposes that the appearance of the article, like its descriptive title, has a secondary meaning, and has been associated in the public mind with the first comer as a manufacturer or source, and if a second comer imitates the article exactly, so that the public will believe his goods have come from the first and will buy, in part at least, because of that deception, the court will enjoin the second comer. Crescent Tool Co. v. Kilborn & Bishop Co., 247 Fed. 299, 159 C. C. A. 393. In this case it was said:

"The defendant has as much right to copy the 'nonfunctional' features of the article as any others, so long as they have not become associated with the plaintiff as manufacturer or source. The critical question of fact at the outset always is whether the public is moved in any degree to buy the article because of its source and what are the features by which it distinguishes that source."

The authorities relied upon by the plaintiff are not in conflict with these views.

In International News Co. v. Associated Press, 248 U. S. 231, 39 Sup. Ct. 68, 63 L. Ed. 211, 2 A. L. R. 293, the conceded evidence which caused the court to grant its protection indicated that the de-

fendant's acts amounted to fraud and bribery. The Supreme Court stated that the complainant had a property right in the news which it secured in the conduct of its business, and restrained the defendant from bribing the employés of the complainant to release the news to the defendant. There is no question of fraud, or palming off by the defendants in this issue, nor is there any claim of deception advanced upon this theory of the case.

In the case of Searchlight Gas Co. v. Prest-O-Lite Co., 215 Fed. 692, 131 C. C. A. 626, mainly relied upon by the plaintiff, the complainant had established a system of service in the sale of its Prest-O-Lite tanks with the right of having them refilled; that is, a new tank filled and given in exchange for the old, at the price alone of acetylene gas. The purchase included the right to return the old tank. There the defendant, with what the court found to be fraudulent intent, sold similar tanks and merely removed the paper sticker from over the Prest-O-Lite name, and turned the misused tank back to the plaintiff, thus using the plaintiff's tanks and selling the defendant's gas. The plaintiff there repaired, at its expense, the tank which had been used by the defendant, and by which method defendant secured profits. It was a fraudulent and deceitful practice, and the court enjoined its continuance. The court, by injunction, simply required the defendants to sell their products under their own name, and did not enjoin anything other than the fraud which was perpetrated. The defendant there was permitted to sell, using its own Prest-O-Lite tanks and its gas with proper labels. This was far from granting immunity from competition.

In Fonotipia Co. v. Bradley (C. C.) 171 Fed. 951, the plaintiff had gone to great expense in preparing musical records of the voices of great artists, and from these produced the commercial records which were sold to the public. The defendant simply copied copies of the original records and put them on the market, advertising that they were all duplicates of the original records made by the artists. This was a fraud and deception, and was enjoined.

In the so-called scalper ticket cases (Nashville Ry. Co. v. McConnell [C. C.] 82 Fed. 65; Illinois Central v. Caffrey [C. C.] 128 Fed. 770; Penn. Co. v. Bay, 150 Fed. 770) nontransferable railway tickets were sold. They were sold, and the transferee went before the validating agent, had them validated, and sold the tickets. An injunction was granted against the ticket sellers' continuation of this business method (scalpers). These cases had all the elements of fraud and deceit. The conductors accepted the fraudulently resold tickets, and were deceived in the belief that the passenger, who had a contract as an original vendee, was exercising his right under his contract of carriage. Because they were return tickets, they were sold at a reduced rate, and the railroad company was thus cheated out of the full and regular fare.

In the trading stamp cases (Sperry & Hutchison Co. v. Mechanics' Clothing Co. [C. C.] 128 Fed. 800; Same v. Temple [C. C.] 137 Fed. 992; Same v. Louis Weber, 161 Fed. 219) there was a deliberate interference with a special contract made between the plaintiff and stores which were giving the trading stamps to their customers. The defendants deliberately sought to induce the merchants to break their

262 F.—11

contract, and the court held them to be guilty of fraud, saying that by their advertisement they deceived the public. An injunction was granted because there was unfair and fraudulent interference with the contracts and the property protected by the contracts.

The record of the case under consideration discloses no palming off of goods or attempt thereto. Nor does it indicate that by advertising or otherwise did the plaintiff retain any property right in the caps or receptacles when sold. There was nothing in the nature of a mere licensee in the sale. It was an absolute exchange of the commodity for the money received, and the vendee acquired absolute property rights in the articles which he purchased, unrestricted in any way. Nor can I find from the record that the caps or receptacles were sold from their appearance alone. Indeed, the distinguishing features are said to be in the concealed contact slots and nicked edge blades. These are recognized in the trade as the main characteristics of the various devices of the plaintiff, and by such they are recognized and distinguished from competing devices, and therefore a means of identification of plaintiff's production.

I conclude, therefore, that plaintiff has no common-law property right, as it claims to have, and it cannot succeed in its position on this branch of the case.

[2] Unfair competition is alleged as against the defendants in copying the physical characteristics of some ten of Hubbell's devices. They are as follows:

(1) The Hubbell hemispherical cap with knurled edge and base with nickeled sleeve.

(2) Hemispherical brass-covered cap.

(3) Elongated cap.

(4) Cord connector.

(5) Motor plug with cylindrical cap.

(6) Brass-covered chandelier plugs.

(7) Cylindrical lamp receptacle.

(8) Flush receptacles with black centers and brass plate.

(9) The use of the word "Duplex."

(10) The use of the word "Standard."

The caps and receptacles are sold largely to jobbers and men who are familiar with the trade. Each manufacturer has plainly visible his trade-name, so that it is easy for a purchaser to tell which he is buying. Hubbell has a distinctive characteristic, as pointed out, which the trade all know. I have examined carefully the physical exhibits which are involved in each of the above 10 claims, where it is said defendants have copied the devices of the plaintiff. Without dealing with each specifically here, I am satisfied that there is no such palming off or even copying of the physical exhibits as to present an actionable wrong. There is no such copying of lines. The plaintiff, in all its advertisements, made plain the distinguishing characteristics of its plug. I find nothing which would warrant an interference by a court of equity because purchasers have been deceived or plaintiff's rights infringed. Shredded Wheat Co. v. Humphrey Cornell Co., 250 Fed. 960, 163 C. C. A. 210.

For these reasons, a decree will be granted to the defendants.