SHREDDED WHEAT CO. v. HUMPHREY CORNELL CO. et al.

(Circuit Court of Appeals, Second Circuit. February 20, 1918.)

No. 145.

1. TRADE-MARKS AND TRADE-NAMES ☞67—UNFAIR COMPETITION—SUBJECTS OF PROTECTION.

If the public has come to associate an article or machine with a single maker, although during the time it is protected by a patent, and to ascribe some of its merit to such source of manufacture, the maker is entitled to some protection, as much when the association is through mere appearance as when it is due to the name by which the article or machine has become known.

2. TRADE-MARKS AND TRADE-NAMES ☞67—UNFAIR COMPETITION—PROTECTION AGAINST BY INJUNCTION.

Under the guise of protecting against unfair competition, courts must be jealous not to create perpetual monopolies.

3. TRADE-MARKS AND TRADE-NAMES ☞93(1)—SUIT FOR UNFAIR COMPETITION —ISSUES—BURDEN OF PROOF.

Where a complainant has shown that the appearance of an article of its manufacture has acquired a secondary meaning with the public, which entitles it to protection, and that it is physically possible to attach or impress upon defendant's product a distinguishing mark, the defendant has the burden of showing that such a mark will impose upon him a commercial handicap, which will practically take from him his right of free competition.

4. TRADE-MARKS AND TRADE-NAMES ☞70(1)—UNFAIR COMPETITION—SUBJECT OF PROTECTION—APPEARANCE OF ARTICLE.

The appearance of shredded wheat biscuits, as made by complainant, the original manufacturer, held to have acquired a secondary meaning with the public, which has come to associate them, because of their appearance, with the original source of manufacture; and while complainant is not entitled to a monopoly of the form, because of a design patent therefor, which has expired, nor of the color, which is the result of the baking, it is entitled to have a later competitor impress upon or attach to such of its biscuits as are not sold to the final customer in cartons some distinguishing mark, unless it can be shown after a sufficient trial period that the cost of any such mark would be such as to practically destroy the right of free competition.

Ward, Circuit Judge, dissenting.

Appeal from the District Court of the United States for the District of Connecticut.

Suit in equity by the Shredded Wheat Company against the Humphrey Cornell Company and Frederick H. Towne. Decree for complainant, and defendants appeal. Modified and affirmed.

For opinion below, see 244 Fed. 508.

Appeal by the defendants from a decree enjoining them from selling any shredded wheat biscuit without distinctly marking upon each biscuit that it was made by the defendant and was not the product of the plaintiff, and from using any cartons having a picture of such biscuit without similar marking. The jurisdiction of the District Court depended upon diverse citizenship.

The plaintiff is a large corporation situated in Niagara Falls, N. Y., and engaged in the manufacture of the familiar article of food, known as "Shredded Wheat Biscuit," under a series of patents of which the original and basic is for a product and process. This patent was granted to one Perky, the original promoter of the enterprise, in October, 1895, No. 548,086, and disclosed a process of boiling the original whole wheat berry, partially drying it, and then forcing it between compression rollers, one or both of which had peripheral grooves, which mashed the several parts of the berry into a heterogeneous soft paste. This paste was then forced out through combs or scrapers, so as to emerge in thin filaments or shreds. The patent states that the wheat in this form is ready for food, though it may be baked in various ways.

In the actual manufacture of the biscuit, the pulpous shreds or filaments which proceed from the combs, as described in the product patent, are carried off upon a web or endless belt, and are built up by a succession of layers until a strand of the desired thickness is secured. This strand is cut at given intervals by knives, thus making the longer edges of the biscuit, which through the pressure of the knives are matted or pressed together. The biscuits are then cooked in an oven which raises the top, except at the longer edges, which have been matted together, separating the shreds, and making more obvious the interstitial texture of the whole. The baking also browns the top, and hardens the biscuit by drying; the color depends upon the manipulation of the heat and somewhat varies with the operator.

In September of the same year Perky took out a design patent for 14 years upon a biscuit, shown in accompanying drawings and rectangular in plan view; the longer axis being about twice the shorter. The end view or section on the shorter axis was ovoid; the bottom or base of the biscuit being flatter than the top. The design also displayed the rough or filamented texture of the biscuit. It described as the leading feature of the design "a fibrous interstitial appearance, showing superimposed layers or irregular interlacing threads or filaments," in such wise that the threads are visible from the surface through the outer layers. This design resulted necessarily from the actual process of manufacture above described.

The plaintiff's predecessor, the Cereal Machine Company, of Colorado, began the manufacture of this product in 1895, and in six years, 1901, it had already attained a wide sale, and has increased enormously, until at the present time the sales amount to hundreds of millions of biscuits each year, distributed in all states of the Union, in Europe, and elsewhere. Accompanying the increase of its business has been an outlay for advertising of many millions of dollars and in all sorts of forms, among which one of the most common has been pictures of the biscuit, either in black and white or in color.

The plaintiff packs the biscuit in cardboard cartons 12 to the box, and sells to the retailer or jobber in cases of 36 cartons for $3.60 each. The cartons have the words "Shredded Wheat Biscuit" upon them, and the name of the plaintiff as manufacturer. In cases where the retailer sells to the consumer for family use, the cartons go along with the biscuits; but a large part of the plaintiff's business consists in sales to hotels, restaurants, lunch rooms, and boarding houses, and the biscuits in such cases necessarily reach the ultimate consumer upon plates or saucers, without any identifying mark.

As a method of advertising, moreover, the biscuits are displayed in restaurants and lunch rooms in large glass globes, without any mark or sign of their source.

The plaintiff, to show the unfair competition upon which the bill was based, was obliged to prove that the mere appearance of the biscuits when out of the cartons was so associated with the plaintiff that it had acquired a "secondary" meaning. To do this it called many witnesses, who swore either that they knew the biscuit as the plaintiff's or that they knew it as coming from a single source, to which they had become accustomed. These witnesses were jobbers, retailers, and consumers. The testimony was uncontradicted, and the defendants do not dispute that the biscuit is so associated with the plaintiff, or at least with some single source, in the public mind.

The defendant company is only a jobber selling the biscuits of the real party in interest, the Ross Food Company, a corporation organized in 1914, by Ross, Valentine, and Towne, formerly employés of the plaintiff for many years. The design patent having expired in 1909, and the product patent in 1912, these gentlemen conceived the project of manufacturing a biscuit identical in substance and appearance with the plaintiff's, and this they began to do in August, 1915. Their efforts had not as yet achieved much success, when in October of that year, three years after the product patent had expired, this bill was filed.

The Ross Food Company markets its biscuits in cartons of 10 each, of which it sells 36 to a case for $2.80. The carton is so totally dissimilar to that of the plaintiff that nothing need be said of it, except that it contains a picture of two of the wheat biscuits, accurate, not only as to its own contents, but necessarily identical with the plaintiff's biscuit. This picture has been used by retailers in the sale of the goods as an assurance that the contents of the carton was shredded wheat biscuit, and the general appearance of the carton in one instance, anyway, was not sufficient to prevent confusion. The plaintiff also produced several witnesses, who said either that they had innocently served the Ross Food Company's biscuit as shredded wheat, or that they had received them as such.

The question litigated upon the trial was whether, assuming that the general appearance of the plaintiff's biscuit had acquired a "secondary" meaning, that justified any relief in view of the design patent, and the defendant's undoubted right to make and sell the biscuits as it chose. Proof was taken as to the feasibility of wrapping each biscuit or tagging it with a distinctive mark, and as to the commercial possibility of making the biscuit in another form, or of impressing some mark upon its top in the process of baking. So far as necessary, this proof is considered in the opinion.

James H. Griffin and John R. Nolan, both of New York City, for appellants.

Breed, Abbott & Morgan, of New York City, Charles K. Offield, of Chicago, Ill., and William C. Breed, of New York City (Edward A. Craighill Jr., of New York City, Frederick I. Allen, of New York City, and George D. Seymour, of New Haven, Conn., of counsel), for appellee.

Before WARD and HOUGH, Circuit Judges, and LEARNED HAND, District Judge.

LEARNED HAND, District Judge (after stating the facts as above). Originally the plaintiff was able to sell its biscuits because the public came to like them. They liked their taste; they liked their appearance; they were converted by their supposititious dietetic value. The art of advertising spuriously reinforced a genuine demand by the power of reiterated suggestion. So far, however, the public was

buying because it wanted, or had been made to think it wanted, the biscuit which the plaintiff produced, and so far there was no ground for any kind of protection. We have recently considered this question in Crescent Tool Co. v. Kilborn & Bishop Co., 247 Fed. 299, —— C. C. A. ——, decided November 13, 1917, and there we held that the right to appeal to the public even in the minutest details of the plaintiff's design was open to all so long as the details had acquired no "secondary" meaning. The evidence shows without contradiction, however, that the long monopoly of the plaintiff has created, as indeed it was bound to create, a state of mind more complex than this; for when one has for a long time bought from a single source some article that one likes, either through conscious reflection or through mere conservative habit, one is apt to impute to its source a part of its putative value. The plaintiff has at least shown that the public has become accustomed to regard its familiar wheat biscuit as emanating, if not from it by name, at least from a single, though anonymous, maker, and the second is as good for these purposes as the first. Saalfield Co. v. G. & C. Merriam Co., 238 Fed. 1, 8, 151 C. C. A. 77. Though the public may, therefore, buy the biscuit because it has come to like it, the plaintiff still has a stake in that other motive for buying; i. e., that it comes from the accustomed maker. It is true that it has at times been said that, where the association of the maker's name with the article has arisen during the monopoly of a patent, it is of slight value. Kellogg Toasted Corn Flake Co. v. Quaker Oats Co., 235 Fed. 657, 658, 149 C. C. A. 77.

[1] But while the public cannot, of course, exercise any preference between makers during the monopoly, they may come, and, as we have said, it is almost inevitable that they should come, to associate some of the supposed merit of a successful article, not only with the advantages due to the patented characteristics, but with the supposed uniformity and reliability of its manufacture. If the public has come so to associate the machine with a single maker, he is, we think, entitled to some protection, as much when the association be through mere appearances as when it be wrapped up in a name, as in Singer Manufacturing Co. v. June Mfg. Co., 163 U. S. 169, 16 Sup. Ct. 1002, 41 L. Ed. 118. It is not necessary that there should be a period after the expiration of the monopoly during which the field was open, and the secondary meaning was acquired or preserved among actual or possible competitors, though the contrary is indeed suggested in G. & C. Merriam v. Saalfield, 198 Fed. 369, 374, 117 C. C. A. 245.

We think, therefore, that prima facie the plaintiff stands with a genuine grievance, an "injuria" of exactly the same kind as the owner of a trade-mark or a well-established "make-up." The difficulty in the case at bar, as it generally does in such cases, lies in giving any remedy which shall not take away the defendant's indubitable rights. The original "secondary meaning" cases like Reddaway v. Banham, [1896] App. C. 199, all turned upon some meaning acquired by words of common speech, to which it cost the defendant little or nothing to add some affix, so that his complaint that he was being deprived of rights in the public domain was thin. Yet in strict principle he was

correct, because prima facie he might use the common speech in any context. The courts were necessarily in fact compromising between two conflicting rights, of which one had no substantial value.

[2] It is in cases where the connotation of origin arises, not from verbal description, but only from the appearance of the article, that the trouble arises in application, because the appearance must in some way be changed, or the article must be wrapped or marked. Thus has arisen the principle often applied in this court that minor, or "nonfunctional," changes in appearance may be required, so long as the substantial elements are left in the public domain. Enterprise Mfg. Co. v. Landers, 131 Fed. 240, 65 C. C. A. 587; Yale & Towne Mfg. Co. v. Alder, 154 Fed. 37, 83 C. C. A. 149. In the same class stand cases like Fox v. Hathaway, 199 Mass. 99, 85 N. E. 417, 24 L. R. A. (N. S.) 900; Fox v. Glynn, 191 Mass. 344, 78 N. E. 89, 9 L. R. A. (N. S.) 1096, 114 Am. St. Rep. 619; Coca Cola Co. v. Gay-Ola Co., 200 Fed. 720, 119 C. C. A. 164; Walker v. Grubman (D. C.) 222 Fed. 478. Indeed, this principle has been pressed very far in this court. Rushmore v. Manhattan Screw & Stamping Co., 163 Fed. 939, 90 C. C. A. 299, 19 L. R. A. (N. S.) 269; Lovell-McConnell Mfg. Co. v. American Ever Ready Co., 195 Fed. 931, 115 C. C. A. 619; Rushmore v. Badger Brass Mfg. Co., 198 Fed. 379, 117 C. C. A. 255. The first Rushmore Case was recognized at the time as trenching hard upon the other limit in application, which is that where the "secondary meaning" is bound up in elements of the appearance which cannot be changed without cutting off the defendant's substantial right to make and sell that kind of goods the plaintiff must suffer the resulting confusion. These are the converse of the "nonfunctional" cases. Daniel v. Electric Hose & Rubber Co., 231 Fed. 827, 145 C. C. A. 647; Marvel Co. v. Pearl, 133 Fed. 160, 66 C. C. A. 226; Diamond Expansion Bolt Co. v. U. S. Expansion Bolt Co., 177 App. Div. 554, 164 N. Y. Supp. 433; Fairbanks v. Jacobus, 14 Blatchf. 337, Fed. Cas. No. 4,608; Meide v. Wallace, 135 Fed. 346, 68 C. C. A. 16; Globe-Wernicke Co. v. Fred Macey Co., 119 Fed. 696, 56 C. C. A. 304; Flagg Mfg. Co. v. Holway, 178 Mass. 83, 59 N. E. 667. Under the guise of protecting against unfair competition, we must be jealous not to create perpetual monopolies.

We do not see any possible change in the appearance of the biscuit itself which would be of enough service to the plaintiff to justify its imposition upon the defendant. Concededly, variation could be enforced only in its form, color, or size. As to form, the plaintiff appears to us finally concluded by its own design patent. Whether or not the evidence might have allowed us to prescribe some variation in the form, had that form been only the result of the plaintiff's original adoption, we do not say. Fox v. Hathaway, supra, suggests that we might have found a way out. But the plaintiff's formal dedication of the design is conclusive reason against any injunction based upon the exclusive right to that form, however necessary the plaintiff may find it for its protection. As to color, also, we feel ourselves limited, because, while the shade of brown depends upon the baking, the plaintiff's own biscuits vary within appreciable limits, and to require the

defendant to adopt a shade different enough for commercial distinction would be to force them to bake their biscuits so that they would be repellant to most tastes. It would, so far as we can see, in effect, either terminate or hopelessly cripple any competition beween the two parties.

With size it is perhaps different, for we are not satisfied that the added cost of turning out a smaller biscuit would be substantial, per pound of shredded wheat. That might, indeed, have to await experiment, if it appeared that a mere change in size would give any effective relief to the plaintiff. There is no reason to suppose that it would, and there is every reason to believe that it would greatly embarrass the defendants. To increase the size of the biscuit would make it impossible to put two in the ordinary saucer; to decrease it, so that three could be sold for the present price of two would obviously increase the cost of that part of the manufacture, after the wheat is shredded, by one-half again, or nearly. We think that such a requirement is fanciful as relief and too onerous upon the defendant.

There remains, therefore, as the only practicable relief, some mark impressed upon the surface of the biscuit in the baking, or some proper wrapping or tag, with an adequate legend. In the imposition of such a requirement, we should observe the same limitation as courts have by general agreement observed in the "nonfunctional" cases; that is, we should be equally jealous to assur the defendant's right freely to compete in the market with the first comer. The question is always commercial; we ought not to impose any burdens which, either by changing the appearance of the article itself, or by imposing expense upon its production, will operate to give the plaintiff such advantage in the market as will substantially handicap his competitors. On the other hand, Judge HOUGH believes that, once the right is assured to the defendant of making the article in all its substantial elements, that is all he can demand. If the similarity between the goods remain such as to create confusion, it is irrelevant that the cost of wrapping, marking, or tagging them may impose too great a burden upon the defendant to allow his continuing in the market. His manufacture, as it exists, is a fraud, and all elements of deception must be removed before it can be permitted to continue.

In the case at bar it remains ambiguous upon this record just what are the commercial possibilities of marking, wrapping, or tagging the defendant's individual biscuits. The evidence is meager as to impressing a mark upon the top of the biscuits during the baking; all we can find is that of Valentine. At one place he says that it would be practicable to impress a cross upon the biscuit while soft that would endure, and the cost would be slight; later he says that, when the biscuit rose in the baking, the mark would disappear or the biscuit would be "deformed." We think that the "deformity" is just what the plaintiff is entitled to require—not a deformity, it is true, which would affect the design dedicated by the design patent, but enough to mark distinctively the biscuit itself. After a careful scrutiny of this record as it stands, we see no reason to suppose that such a requirement is not possible.

The evidence as to wrapping or tagging each biscuit is, if possible, still more meager. Ross swears that the paper alone for wrapping would cost 25 cents per case, raising the cost from $2.80 to $3.05. How far the cost of labor and breakage would increase this he does not know. A paper tag or band, if put on before baking, would be destroyed, and, if put on afterwards, must be pasted. What the cost of pasting would be does not appear, nor whether a paste could be obtained which would be unobjectionable upon an article of food. It would certainly appear as though each of these would be a reasonable possibility.

[3, 4] The record appears neutral in respect of these matters, and in the view I take personally all depends upon whose is the burden to show that there is or is not a commercially practicable means to discriminate. I think that since the plaintiff has shown that the appearance of its biscuit has acquired a "secondary" meaning, and that it is physically possible to attach or impress upon the defendant's biscuit a distinguishing mark, the defendant has the burden of showing that such a mark will impose upon him a commercial handicap which will practically take from him his free right to compete. I therefore agree with Judge HOUGH that the defendant should be compelled to put some distinguishing mark upon each biscuit sold to any final purchaser out of the carton. This mark need not be what the District Court required, that is, a statement that the biscuit was made by the defendant, and not by the plaintiff, but something sufficiently obvious to distinguish the two, as a cross, a line, or a letter, if the mark be impressed or a suitable legend if paper be fastened to the biscuit. Such a requirement does not, however, apply to those biscuits which reach the final purchaser in cartons; that is, to those which are not sold to hotels, restaurants, lunch rooms and boarding houses. The defendant's cartons are so different from the plaintiff's that no confusion is possible.

I think that as respects the marking, wrapping, or tagging of individual biscuits the case is such that only commercial experience can finally tell what are the possibilities. I would therefore add to the requirements imposed above a probationary period, within which the defendant must try in good faith to accommodate itself to this necessity. This portion of its trade is less than 10 per cent., and it cannot prove a formidable obstacle for six months to require it to comply, provided that at the end of that time it have leave to demonstrate that compliance is equivalent to destruction of its right of free competition. The burden will be upon it to show that it has exhausted all the possibilities of effective distinction between the biscuits, and that each involves an expense which will not permit it to maintain that part of its trade without a handicap that forbids any assurance of a reasonable profit and a continued competition in that line. While Judge HOUGH does not think that such a probationary period is necessary, since the result would be irrelevant, he agrees to a disposal of the case upon those terms.

The decree will therefore be modified as follows: First, by relieving the defendants of any injunction in the sale of such biscuits as

shall reach the last purchaser in cartons; second, all biscuits reaching the last purchaser outside of their cartons must either bear a letter, cross, or other plain symbol, impressed in their substance, or have fastened upon them a wrapping, tag, or band, stating that they are made by the Ross Food Company; third, the defendant at the end of six months may apply to the District Court to be relieved of the second requirement, upon showing that after a bona fide trial of all possible expedients it cannot comply with that provision, except at an expense which would make impossible any continued competition in the business of selling biscuits outside the cartons with any assurance of reasonable profit.

As so modified, the decree is affirmed, without costs.

WARD, Circuit Judge (dissenting). After the expiration of the complainant's product and design patents, the public generally had the right to manufacture the same article under the same name and in the same form. This was the condition on which the expired monopolies were granted. The defendant concededly does not use the same name, nor sell the article in a similar carton. It sells its article as "Whole Wheat" biscuit, in entirely different cartons, nor is there any evidence of unfair advertising.

I understand the court to agree that the defendant may make and sell its biscuit in the same form, color, and size as complainant's. The only question is what, if any, protection the complainant should have, in view of the secondary meaning its product has acquired from its mere appearance. When both parties mark their product, unfair imitation of the original producer's mark should be enjoined, as in Singer v. June Manufacturing Co., 163 U. S. 169, 16 Sup. Ct. 1002, 41 L. Ed. 118. In this case, however, neither party marks the biscuit itself, and it would obviously impair the strength and deform the appearance of this very fragile biscuit to do so.

The complainant's claim to be protected in any secondary meaning its goods have acquired can go no further than its injury, and that is only so far as the public buys or is likely to buy the defendant's product supposing that it is the complainant's. The retail dealer and the purchaser of cartons are not misled. Guests in boarding houses and hotels on the American plan take what they are given. It is only a very small part of the public, namely, those who patronize lunch rooms, restaurants, or hotels on the European plan, and who order biscuit which they see on the counters, or on plates or saucers, supposing they are the complainant's, when they are really the defendant's manufacture. This seems to me an insufficient reason for giving the complainant a monopoly for all time of what apparently is the best size of this ordinary commercial article, unless the defendant and other manufacturers adopt distinguishing marks which either increase the cost of manufacture or deform and weaken the product.

Moreover, I think that the form and size of the biscuit as always made by the complainant are functional, and that imitation of these features is no evidence of unfair competition. The form evidently

tends to strengthen a product made out of such fragile material and the size is apparently the best fitted for use as a breakfast food on a saucer. I think the bill should be dismissed.