## UPJOHN CO. v. WM. S. MERRELL CHEMICAL CO.

(Circuit Court of Appeals, Sixth Circuit.   December 15, 1920.)

No. 3295.

1. **Trade-marks and trade-names ⊚⇒68—Only attempt to sell goods as plaintiff's is unfair competition.**

    A plaintiff is entitled to relief against unfair competition only where defendant attempts to palm off on the purchasing public his goods as the goods of plaintiff.

2. **Trade-marks and trade-names ⊚⇒28—Imitation unfair only if appearance has public recognition.**

    Where the imitation of plaintiff's goods relates only to matters as to which defendant has prima facie a right equal to plaintiff's, there must have been a public acquiescence in plaintiff's appropriaton of those things for his product, whereby they have become indicia of origin, to make the imitation unfair competition.

3. **Trade-marks and trade-names ⊚⇒28—Descriptive identification must have existed long enough to acquire public sanction.**

    While title to identification words or marks that are arbitrary, so as to be proper trade-marks, is at least initiated by appropriation, no title or quasi exclusive right exists to means of identification which are merely descriptive, or which for any reason are known and open to all, unless there has been public sanction of the appropriation by acquiescence continued long enough and under circumstances suitable to raise a presumption that the public concedes the right.

4. **Trade-marks and trade-names ⊚⇒69—Intention to receive benefits of publicity not enough to establish unfair competition.**

    Where plaintiff had begun advertising and marketing a product under a distinctive arbitrary name, the mere fact that defendant copied the size, color, and shape of plaintiff's product, which were all matters equally open to the public before plaintiff adopted them, to obtain the benefit of plaintiff's publicity does not in itself establish unfair competition, when plaintiff's product had not been on the market long enough for its appearance to have acquired public recognition, as indicating origin, and where the arbitrary trade-mark was not infringed.

5. **Trade-marks and trade-names ⊚⇒28—Few months' use does not give public sanction to appearance.**

    In a suit for unfair competition by copying plaintiff's product, the situation must be judged as it existed when defendant introduced his copy of the product, and the fact that at that time plaintiff's product, which was a medical preparation, whose composition and appearance were alike open to everybody, had been in the hands of retailers and advertised to physicians for a few months, does not establish a sanction of plaintiff's appropriation of that composition and appearance by the consuming public, sufficient to prevent its subsequent appropriation by defendant.

6. **Trade-marks and trade-names ⊚⇒28—Unnecessary that plaintiff's product be known by his name.**

    To establish unfair competition by copying the appearance of plaintiff's product, it is not necessary that the appearance has received a public sanction connected with plaintiff's name, if it has received such sanction as to identify the article sold under plaintiff's trade-mark or trade-name.

Appeal from the District Court of the United States for the Western Division of the Southern District of Ohio; Howard C. Hollister, Judge.

Suit by the Upjohn Company against the Wm. S. Merrell Chemical Company.   Decree for defendant, and plaintiff appeals.   Affirmed.

⊚⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

The plaintiff below, appellant here, is a well-known manufacturer of pharmaceutical preparations. In the spring of 1908 it became convinced that there was a large field for the marketing of phenolphthalein, a laxative or cathartic drug, and determined to select the most desirable tablet form in which to put the same on the market. Tablets of this class were usually composed of the drug, an excipient or carrier (commonly cane sugar), a flavor, and a color. Several colors were in common use and regarded as more or less suitable— among them, pink. A great variety of shapes had been employed; among them, a thin, oblong, rectangular form, properly called a wafer, had been used. Wintergreen and other flavors or mixtures of flavors, to cover and disguise the taste of the drug and make the tablet acceptable, were in common use. The size could be as desired; but, if the tablet was to contain one grain of the drug and sugar enough for most efficient mixing, a particular size would result. If it was thought that one-half the dose given by the complete tablet might be sufficient in some cases, it was known that the tablet could be scored across the center, so that it would easily break into two equal parts. With this situation before it, plaintiff made a thin, oblong, rectangular wafer, colored pink, with a specially compounded flavor, of a size appropriate to one grain of the drug, and scored across the center. While all these various elements were old, no one had ever put upon the market a tablet having this combination of size, shape, and color or any one near enough thereto so as to make confusion.

For this article plaintiff adopted the arbitrary trade-name "Phenolax" or "Phenolax Wafer" and during the spring and early summer advertised it extensively in the medical and trade journals, and sent circulars and samples generally to the druggists, physicians, dentists, and nurses throughout the United States. The extent of this advertising is indicated by the cost, which (perhaps including the whole year) was $30,000. A force of salesmen at once began making sales and was successful on a large scale. Reduced to terms of single wafers (though the sales were in packages) more than a million had been sold by July 1st, and 18 million by the end of the year. It may fairly be assumed that by October the sales had been 6 or 8 million. So far as appears, these sales were to druggists and pharmacists, wholesale and retail. The advertising sent to physicians had been intended to bring about purchases by them from the druggists, or prescriptions by them to be filled by druggists.

Defendant was also an established manufacturing chemist or pharmacist. The fair inference from the testimony is that, in the summer or early fall of 1908, the salesmen of the defendant found the phenolax wafers on the market, sent them to defendant, and defendant determined to make the same thing, in the same form, with the expectation that it would thereby be able to fill with something "equally as good" a part of the demand for a phenolphthalein tablet which plaintiff was creating. To this end defendant put out a tablet, which was indistinguishable from plaintiff's, and was of the same shape, size, color, and flavor. It did not, however, use in any form the name "phenolax," and it put its product up in bottles or packages of standard form, bearing prominently its own name as manufacturer, and marked "phenolphthalein wafers." It is not claimed that in the bottles or cartons, or anything except the wafer itself, there was fraudulent imitation or unfair competition.

F. L. Chappell, of Kalamazoo, Mich. (Chappell & Earl, of Kalamazoo, Mich., on the brief), for appellant.

Walter F. Murray, of Cincinnati, Ohio, for appellee.

Before DENISON, DONAHUE, and WARRINGTON, Circuit Judges.

DENISON, Circuit Judge (after stating the facts as above). [1-3] The plaintiff filed its bill in the court below, based upon the theory of unfair competition; but it is not denied that defendant had, inherently and originally, the same right plaintiff had to select from the common

stock this particular size, shape, and color. The opinions of this court, within recent years, have discussed many aspects, if not all, that arise in unfair competition.[1] It would be useless to repeat what has been there said, or to refer again to the decisions of the Supreme Court and other courts there cited. They affirm or lead to the conclusions that plaintiff can have relief only against an attempt to palm off on the purchasing public the goods of defendant as the goods of plaintiff; that where the imitation relates only to matters as to which the defendant has, prima facie, a right equal to plaintiff, there must have been a public acquiescence in plaintiff's appropriation of these things for his product—a public sanction of the taking—sufficient to have created that secondary meaning whereby they have become, to the public, indicia of origin; and that while, when the plaintiff has selected as his means of identification words or marks that are arbitrary, and hence proper trade-marks, his title is at least initiated by the appropriation, yet as to those means of identification, which are descriptive, or which, for any reason, are known and open to all, there is no basis, in principle or in authority, for the creating of a title or quasi exclusive right in plaintiff, except the theory that there has been this public sanction of plaintiff's appropriation, by acquiescence which has continued long enough and under circumstances suitable to raise a presumption that the public concedes the right and to make it inequitable thereafter to dispute it.[2]

We have not cited the equally well-known cases involving technical trade-marks, because though there is at least analogy as to the basis of the right, there is claimed to be substantial distinction. In Rectanus v. United Co., 226 Fed. 545, 141 C. C. A. 301, this court considered a case where the plaintiff attempted to assert strictly trade-mark rights in advance of his trade; when the Supreme Court reviewed the same case (United Co. v. Rectanus, 248 U. S. 90, 39 Sup. Ct. 48, 63 L. Ed. 141), it seemed to plant the trade-mark rights (248 U. S. 100, 39 Sup. Ct. 51, 63 L. Ed. 141) upon the established results of trade—that is, upon the secondary meaning acquired by public sanction—and to hold that the mark could not go beyond the trade. It may be the essential theory of that opinion that there is no difference, as to the basis of the right to exclude others, between the case of the arbitrary

[1] Merriam v. Saalfield, 198 Fed. 369, 117 C. C. A. 245; Coca-Cola Co. v. Gay-Ola Co., 200 Fed. 720, 119 C. C. A. 164; Samson Co. v. Puritan Co., 211 Fed. 603, 128 C. C. A. 203, L. R. A. 1915F, 1107; Knabe Co. v. American Co., 229 Fed. 23, 143 C. C. A. 325; Meccano Co. v. Wagner (D. C.) 234 Fed. 912; Kellogg Co. v. Quaker Co., 235 Fed. 657, 149 C. C. A. 77; Saalfield v. Merriam, 238 Fed. 1, 151 C. C. A. 77; Thum v. Dickinson, 245 Fed. 609, 158 C. C. A. 37; Helmet Co. v. Wrigley Co., 245 Fed. 824, 158 C. C. A. 164; Peninsular Co. v. Levinson, 247 Fed. 658, 159 C. C. A. 560; Werk Co. v. Grosberg, 250 Fed. 968, 163 C. C. A. 218.

[2] It is not material to the present case whether that public acquiescence must involve the refraining from lawful competition and so would not reach a case where and while a patent gave a monopoly (Merriam v. Saalfield, supra, 198 Fed. at page 374, 117 C. C. A. 245), or is sufficient if it involves only the public education to the point where it thinks of the original when it sees the copy (Shredded Co. v. Humphrey Co. [C. C. A. 2] 250 Fed. 960, 963, 163 C. C. A. 210).

trade-mark and the case of the descriptive word. Yet that court had recently held (Hamilton Co. v. Wolf, 240 U. S. 251, 36 Sup. Ct. 269, 60 L. Ed. 629) that the trade-mark owner could recover all the profits realized by the infringer. The opinion of Judge Hook (206 Fed. 611, 619, 124 C. C. A. 409) sufficiently indicates that the award which the Supreme Court affirmed included all the infringer's profits, without regard to whether plaintiff's trade had ever reached the locality of the infringing sale. It may be thought that the complete affirmance of the entire award can rest only on the theory (stated by Judge Hook, 206 Fed. 619, 620, 124 C. C. A. 409) that a technical trade-mark, adopted and used, gives an exclusive right projected into territory which plaintiff's trade has not yet entered. Of course, no inconsistency between the Hamilton and the Rectanus Cases can have been intended. It is immaterial, in the present case, whether the basis of right is or is not just the same with the arbitrary mark as with the descriptive word; if there is any difference, it is narrower in the case of the nonarbitrary mark. In that case—and the present case is of that type—certain it is that there is no recognized basis of any right to exclude others, save that extent and kind of public sanction which has induced a common identification of maker by product, and that only in this way can a plaintiff claim to have any property rights to be protected. Equally certain it is that the existence of such public sanction and identification has never been inferred from facts so ambiguous and indefinite as we find here.

[4] This record does not justify a conclusion that defendant adopted and has sold its form of tablets with the intent that it should be substituted for "phenolax wafers" with purchasers who wanted phenolax and supposed that was what they were getting; though it must be conceded that the case, on its facts and with reference to this inference of fact, is close to the line. It would not be credible that defendant adopted this combination of characteristics merely because it thought them suitable; there were plenty of other sizes, shapes, and colors it might have adopted; it must have copied plaintiff's complete combination because it expected to get commercial benefit from the copying. This is not enough; to be condemned, it must have expected to practice a fraud or contribute to the practicing of it. There was room for it to get legitimate benefit from the copying through use by those (physicians or patients) who were attracted by the selected characteristics and who had no concern as to the maker or as to "phenolax."

[5] The situation must be judged as it was about October, 1908, when defendant came on the market. The classes of purchasers who could then be thought of as perhaps to be defrauded were the direct purchasers, being the druggists and perhaps doctors, and the indirect, the ultimate user, being either the patient with the prescription or the buyer for his own use. There is no room to think there was intent to defraud the direct purchaser, because what was done was not appropriate for that purpose. All such sales were made in defendant's own packages, marked with its own name and label. Plaintiff and defendant were known as competitive manufacturers, and no druggist who bought defendant's goods from defendant could have

supposed he was getting plaintiff's goods. When we come to the other class, the ultimate user, we have a very peculiar situation. If the plaintiff's goods had established themselves with this class of purchaser, so that they were known as plaintiff's goods (not necessarily by plaintiff's own name; it might as well be by a trade-name), we would be driven to the conclusion that defendant intended to take advantage of the confusion and substitution which would result.

The trouble is that there was, in October, 1908, no such reputation established with this class of purchasers. There is no direct evidence on this subject, and we must draw the natural inferences. The article had just been introduced to the trade that summer; only by the filling of prescriptions and by sales induced by the druggists had the article become known to the consumer; and the best that can be said is that the stage was set for the formation of the phenolax habit—not that any appreciable fraction of the community had acquired it. Such a secondary meaning as is here involved comes gradually. We do not think it can be manufactured overnight by intensive advertising. There is, to our minds, no satisfactory basis for finding that about October, 1908, the consuming public had come to the belief that tablets of this appearance were "phenolax"; and short of such rather general belief, plaintiff could have no quasi exclusive right which was then infringed by defendant.

[6] We do not place dependence upon the fact that the purchasing public would not be familiar with plaintiff's name; for the existence of a secondary meaning or an identification coming from appearance is sufficient, if it brings deceit as to identity of the article sold under plaintiff's trade-mark or trade-name. Saalfield v. Merriam, 238 Fed. 1, 8, 151 C. C. A. 77; Shredded Co. v. Humphrey Co., supra. Nor do we overlook the fact that similarity in appearance would be more significant with a medicinal tablet than with a piece of furniture. In the latter case the question of origin is important only as to materials and workmanship, and of these the purchaser can largely judge for himself, while in the former case the efficiency of the drug must depend upon the skill and honesty of the maker, and so the purchaser cares more about getting the original whose merits he knows; but neither of these considerations can compensate for the lack of that established reputation among purchasers whereby, and only whereby, the trade dress can indicate origin.

Since defendant entered the field, it has continued without interruption, and of late years other imitators have also appeared. If plaintiff's rights were not sufficiently exclusive in October, 1908, to justify injunction, they have not since become so. Nor, if the tablet then adopted did not then carry deception to the public, for lack of a public so educated as to be likely to be deceived, does it help plaintiff to say that the drug was the article sold, and the tablet was the container or package.

Each case depends so absolutely upon its own circumstances that a controlling precedent is not to be expected. Each of the cited cases upon which plaintiff specifically relies depends upon the finding that the consuming public had come to regard the trade dress as indicating

that the thing was the article which it was in the habit of buying and wanted to get. Schlitz Co. v. Houston Co., 250 U. S. 28, 39 Sup. Ct. 401, 63 L. Ed. 822; New England Co. v. Marlborough Co., 168 Mass. 154, 46 N. E. 386, 60 Am. St. Rep. 377; Thum Co. v. Dickinson, supra; Samson v. Puritan, supra; Elgin Co. v. Illinois Co., 179 U. S. 665, 21 Sup. Ct. 270, 45 L. Ed. 365; Capewell Co. v. Mooney (C. C. A. 2) 172 Fed. 826, 97 C. C. A. 248; Sterling Co. v. Spermine (C. C. A. 7) 112 Fed. 1000, 50 C. C. A. 657. On the other hand, the relief has been denied in many cases with facts more or less analogous to those here. See American v. Saginaw (C. C. A. 6) 103 Fed. 284, 43 C. C. A. 233, 50 L. R. A. 609; Diamond Co. v. Saginaw Match Co. (C. C. A. 6) 142 Fed. 727, 74 C. C. A. 59; Globe Wernicke Co. v. Macey (C. C. A. 6) 119 Fed. 696, 56 C. C. A. 304; Keystone Co. v. Portland Co. (C. C. A. 1) 186 Fed. 690, 108 C. C. A. 508. The rule in the Second Circuit finds its last construction in Shredded Co v. Humphrey Co., 250 Fed. 960, 163 C. C. A. 210.

Perhaps the result which we reach in this case, rested as it is upon the fact that defendant copied the product and began its competition before there was time for plaintiff to get the indicative effect of its trade dress sufficiently established, is most severely tested by saying that this would make the diligent thief immune, while the one who might hesitate and delay must give up his plunder. The answer is that there can be no larceny, unless the title or possessory right of the first holder is better than that of the second taker, and that in this case, until the general public belief among users that tablets of this appearance were phenolax wafers had come into existence, plaintiff's title to this combination of characteristics was no better than defendant's.

If it is said that there is injustice in a state of the law which denies protection to a plaintiff who has expended $30,000 in introducing his peculiar tablet, it must be remembered that in this case the expense indivisibly inured to the advantage of the trade-mark "phenolax," which is now fully respected; and in any such case it may be a lesser evil that plaintiff must fail of full protection than that free choice of common form should be denied to competitors.

The court below dismissed the bill, and its decree is affirmed.