## Quaker State Oil Refining Co. v. Steinberg et al.

*Robert T. McCracken,* for exceptants.

*Frampton & Courtney* and *Pepper, Bodine, Stokes & Schoch,* contra.

PARRY, J., January 29, 1936.—We have before us an adjudication in equity restraining the defendants from continuing the use of the trade name Quaker City for a motor oil on the ground that the plaintiff corporation, marketing oil named Quaker State, has acquired a superior if not exclusive right to the word Quaker as applied to motor oil and hence the defendants' use of it constitutes unfair trade competition.

Upon careful consideration of the record and the law we are of the opinion that certain of the chancellor's findings of fact are unwarranted by the evidence, that his conclusions of law cannot be sustained and that the decree must be reversed.

We think the word Quaker is a descriptive term not capable of exclusive appropriation by anyone and that it may be used by the world at large in an honestly descriptive and nondeceptive way. The use of truthfully descriptive terms may not in any case be absolutely prohibited, the first trader being entitled as against another only to such protection as will prevent such other from using the term to pass off his goods as those of the original appropriator: 63 C. J. 425.

Now the general rule appears to be that use of a descriptive word or term will not be enjoined where it has not acquired a secondary meaning and the dress of the defendant's product is so unlike that of the plaintiff that the two will not be confused. The term Quaker City is everywhere taken as synonomous with Philadelphia and appears to be honestly descriptive of a business established there. Neither is there any pretense that the

containers used by the defendants resemble those of the plaintiff. It was incumbent therefore upon the latter to show that the word Quaker had acquired the secondary meaning of Quaker State so that the confusion or deception of the public would result from the use by the defendants of the word Quaker in the term Quaker City.

The learned chancellor appears to have been misled by testimony showing the vast quantity of oil sold by the plaintiff, its numerous service stations, the immense sums it spends for advertising in publications of extensive circulation, the indefatigable efforts that it has made to extend its business and suppress competition and the magnitude of its operations as compared with the defendants. There is plenty of evidence in support of his findings in this regard but it is really beside the question in dispute.

It appears to us that the somewhat voluminous testimony relied on to support the plaintiff's contentions is singularly inconclusive and does not afford a sufficient ground for the broad and positive findings of fact in the adjudication, upon which are based conclusions of law with which we are not altogether in accord. To discuss the findings at length would be unduly to extend this opinion and we shall state as briefly as we can our understanding of the facts and the applicable law and why we think the plaintiff's proof does not entitle it to a decree.

It is undisputed that in 1914 the plaintiff or, rather its predecessors, placed upon the market a high-grade motor oil bearing the trade name Quaker State Medium Oil, particularly recommended to owners of Franklin air-cooled automobiles but also sold generally throughout the United States with a consistent increase in the volume of sales until today. As the plaintiff's succession was admitted it is impossible to speak with strict accuracy as to the date, but it may be inferred from certain exhibits in the record that about 1919 the plaintiff sub-

stituted on its containers and signs the name Quaker State Motor Oil, which it has used ever since.

It is likewise undisputed that the defendants in the year 1919 began the sale on a small scale of a high-grade motor oil to which they applied the name Quaker City. At first they dealt directly with automobile owners operating fleets of trucks, but in 1920 they started to sell their product through service stations and garages and have continued to do so in increasing volume, although their annual business of 140,000 gallons is still small as compared to the plaintiff's 10,000,000 gallons.

The complaint concerns only the use of the word Quaker. There is no contention that the defendants' product is not as good as the plaintiff's or that they have simulated the plaintiff's containers, labels or display signs, which are different in color and design. The suit is not for the infringement of any trade mark but is brought on the broad ground of unfair trade competition. In such cases equity intervenes not only in aid of the plaintiff whose business is or may be injured by unfair and fraudulent competition but also for the benefit of the public, who are entitled to reasonable protection from persons attempting to pass off their goods for another's, whether of inferior quality or not: B. V. D. Co. v. Kaufmann & Baer Co., 272 Pa. 240; Scranton Stove Works v. Clark et al., 255 Pa. 23; Croft v. Day, 7 Beav. 84, 49 Eng. Repr. 994.

It is because of this policy of protecting the public interest that courts in other jurisdictions have, in cases of unfair competition as distinguished from trade-mark cases, restrained the use of a certain word although the plaintiff can claim no exclusive right to it. This view of the matter is explained by Bradford, J., in Dennison Mfg. Co. v. Thomas Mfg. Co., 94 Fed. 651, 659:

"The word may be purely generic or descriptive, and the mark or symbol indicative only of style, size, shape, or quality, and as such open to public use 'like the adjectives of the language,' yet there may be unfair com-

petition in trade by an improper use of such word, mark or symbol. Two rivals in business competing with each other in the same line of goods may have an equal right to use the same words, marks or symbols on similar articles produced or sold by them respectively, yet if such words, marks, or symbols were used by one of them before the other and by association have come to indicate to the public that the goods to which they are applied are of the production of the former, the latter will not be permitted, with intent to mislead the public, to use such words, marks, or symbols in such a manner, by trade dress or otherwise, as to deceive or be capable of deceiving the public as to the origin, manufacture or ownership of the articles to which they are applied".

If for the moment this be taken as an accurate statement of the law, the plaintiff must assume the burden of proving the existence of certain conditions with regard to the word Quaker: (1) prior use, (2) association by the public with the plaintiff's product, (3) intent by the defendants to mislead the public by using the word, and (4) probability of such deception.

The first and third of these need not detain us, for a prior use is conceded and it has been held in Pennsylvania that intent to mislead need not be shown: Pennsylvania Central Brewing Co. v. Anthracite Beer Co., 258 Pa. 45, and cases therein cited.

The second has come to be referred to in the cases and textbooks as the doctrine of "secondary meaning", and upon this the fourth condition appears to depend, for if the public has not associated a secondary meaning to the word its use can cause no deception.

The plaintiff herein offered a large number of letters and a certain amount of oral testimony to show that the word Quaker had acquired a secondary meaning as applied to motor oil and that the rather vague body called "the public" had become accustomed to refer to and ask for the plaintiff's product by the word Quaker alone without adding the word State. Whether these letters

should have been admitted without an opportunity to the defendants to cross-examine the writers, and whether they tend to show that a secondary meaning at any time attached to Quaker, is, we think, extremely doubtful, but they were certainly incompetent to show that such meaning had attached in 1919 or 1920, for every one of them was written long after that time. The oral testimony also relates entirely to a later period. The situation however must be judged as it was in 1920 when the defendants entered the field as a competitor of the plaintiff. If the word Quaker had not then acquired a secondary meaning it matters not that it may have done so since, or in other words if the defendants' adoption of the name Quaker City in 1919 or 1920 was not unfair then it cannot be declared so now.

This conclusion appears so obvious that we should feel no hesitation in reaching it without the aid of precedent; one exists, however, in Upjohn Co. v. Wm. S. Merrell Chemical Co., 269 Fed. 209, where the plaintiff had, in 1908, placed upon the market pink pills of a certain size and shape, so grooved that one tablet could easily be broken into two. A few months later the defendant offered for sale the same kind of pill in exactly the same color, size, and shape. The plaintiff did nothing until 1920, when it brought a bill to restrain the sale of such pills by the defendant on the ground of unfair competition. Denison, J., held:

". . . where the imitation relates only to matters as to which the defendant has, prima facie, a right equal to plaintiff, there must have been a public acquiescence in plaintiff's appropriation of these things for his product— a public sanction of the taking—sufficient to have created that secondary meaning whereby they have become, to the public, indicia of origin . . . as to those means of identification, which are descriptive, or which, for any reason, are known and open to all, there is no basis, in principle or in authority, for the creating of a title or quasi ex-

clusive right in plaintiff, except the theory that there has been this public sanction of plaintiff's appropriation, by acquiescence which has continued long enough and under circumstances suitable to raise a presumption that the public concedes the right and to make it inequitable thereafter to dispute it."

The learned judge then held that, though pills of that character may subsequently have become known as the plaintiff's product, nevertheless they had not acquired such secondary meaning in 1908 when the defendant's pills first appeared, and that it was as of that date that the case must be decided.

The plaintiff however contends that the showing of a secondary meaning, while helpful, is not essential and that mere probability of confusion as a result of the defendants' use of the word Quaker is sufficient to entitle it to a decree. We question whether the two propositions are really different, for there could be no confusion until the word Quaker had come to signify motor oil of a particular origin. As we read the cases, none of which appears to deal expressly with this point, the confusion to be guarded against is confusion as to the origin of the goods. The difficulty really results from the free use of the term confusion by the courts when in truth no single word is adequate to describe the situation. In most of the cases, however, there is present the element of secondary meaning, a phrase we use for convenience though it too leaves something to be desired. The plaintiff has cited but two cases in which it appears to be lacking, neither of which is controlling or in our view persuasive, and which we notice only because they are relied on: N. K. Fairbank Co. v. Luckel, King & Cake Soap Co., 102 Fed. 327, 330, and Trimble v. Woodstock Mfg. Co., Inc., 297 Fed. 524.

In the first of these the court enjoined the use of the trade name Gold Drop for a washing powder upon complaint of the makers of Gold Dust, saying:

"The controlling question is whether or not the re-

spondent has 'knowingly put into the hands of the retail dealer the means of deceiving the ultimate purchasers.' "

In making this statement we think the court tacitly accepted the theory of a secondary meaning. A dealer could not deceive purchasers by selling them Gold Drop for Gold Dust in dissimilar packages unless to the purchasers the word Gold had come to indicate washing powder of a particular origin.

In the second case the plaintiff's trade mark Kiddie Koop was held infringed by the use of the name Kumfy Krib. The names involved were not generic or descriptive terms originally open to all, hence there was no occasion to invoke the doctrine of secondary meaning. The plaintiff had only to convince the court that its "arbitrary and fanciful design", to which it had been granted an exclusive right by trade mark, had been imitated.

To return to the adjudication we find that the twelfth, thirteenth, and fifteenth findings of fact are supported only by evidence relating to the years after 1920, and there is no evidence that these conditions existed in that year or before, hence those findings are hereby set aside as the exceptions thereto are sustained. The fourteenth finding is altogether misleading. It is that "in some instances persons wishing to buy Quaker State motor oil have been supplied with Quaker City motor oil made by defendants". The plaintiff contends that it is based on the testimony of two of the defendants' witnesses, that of Segal on page 182 of the record and of Kay on page 186. On page 182 we find:

"By the Court: What did they take when they asked for Quaker State two or three times a month?

"A. I ain't got it.

"Q. What did they ever take instead?

"A. Quaker City. I told them it is good, Quaker City.

"Q. They took Quaker City?

"A. If he wants to take Quaker City, I sell him Quaker City."

Such testimony only shows that the purchaser, being unable to procure Quaker State, deliberately chose Quaker City as he might have chosen Gulf or Sun or any other oil, not that the dealer palmed off one upon him for the other.

Kay's testimony likewise shows that he informed the customers he had not Quaker State but another 100 percent Pennsylvania oil called Quaker City, which they took if they chose.

The exception is sustained and the finding set aside.

The twentieth finding is to the effect that confusion has arisen in the public mind between the products of the parties. There is no direct evidence by any member of the public that he was ever confused because of any similarity in the names of the two oils. This finding is really a conclusion or deduction based on the same evidence that was offered to show that Quaker had acquired a secondary meaning. We have shown that the confusion which equity will act to prevent must result from the word in question having become an indication of the origin of a product before being adopted by the defendants. Hence the finding of confusion must fall if there can be no finding of a secondary meaning to support it. To disregard the element of secondary meaning in the confusion is to open the door to all sorts of speculation and the interference of equity in cases where the likeness is remote, in aid of forgetful and inattentive persons. The twentieth finding of fact is therefore set aside as the exception thereto is sustained.

The other findings of fact to which the defendants except relate the times at which the parties became aware of each other's existence and bear upon the question of laches. There was testimony that the defendants did not know of Quaker State motor oil when they chose their name, nor until 1923 or 1924. However it also appeared that one of them had prior to 1919 been a salesman for Amalie motor oil, also recommended for Franklin cars, wherefore the chancellor bases a finding on the assump-

tion that he must have been in garages where Quaker State was conspicuously on sale and must have known of its existence when choosing the name Quaker City.

On the other hand to explain the delay in bringing suit certain of the plaintiff's officers testified that they knew nothing of Quaker City oil until about the year 1929 though one of them was an officer of the Pennsylvania Grade Crude Oil Association, of which the defendants became members in 1927. As long ago as 1920 Quaker State and Quaker City signs were displayed and the oils sold in the same establishments, resorted to at times by agents of the plaintiff, yet the chancellor found the president of the plaintiff company ignorant of the existence of Quaker City oil until 1929. While this may be true, the question whether the president knew is unimportant if he might and should have known.

We agree with counsel for the defendants that these findings are inconsistent, considering the evidence on which they are based, but we think them unimportant as it is conceded that the plaintiff allowed four years to elapse after it was aware of the situation before taking any action in the premises.

For the findings set aside we substitute the following:

12. There is no evidence that as early as the year 1920 the word Quaker had acquired a secondary meaning as applied to motor oil so that the effect of its use in the name of any motor oil was to indicate that such oil was produced by the plaintiff.

13. There is no evidence that as early as the year 1920 the word Quaker had acquired such significance as an indication of the origin of motor oil that there was likelihood of purchasers desiring the plaintiff's product obtaining the defendants' instead.

14. There is no evidence that in 1920 when the defendants placed Quaker City motor oil upon the market there was likelihood of confusion of such oil with Quaker State motor oil, produced by the plaintiff.

15. There is no evidence that persons wishing to buy Quaker State motor oil have ever been fraudulently or by mistake supplied with Quaker City motor oil.

Turning now to the conclusions of law, it becomes apparent from what we have said concerning confusion that the defendants' exceptions to the seventh and eighth must be sustained. The ninth is irrelevant since there is no evidence that the word Quaker had become fixed in the minds of consumers as indicating the origin of motor oil prior to the defendants' adoption of it, hence the exception to it is sustained. For the same reasons the exceptions to the tenth, eleventh, and thirteenth conclusions are sustained. The fourteenth conclusion is irrelevant and is set aside, for we are not concerned with how the defendants might do business but whether they are doing it unfairly.

The fifteenth conclusion, that it was the duty of the defendants to make an investigation to ascertain whether the word Quaker had been appropriated to a specific use, appears altogether immaterial. Whether there was any such burden on the defendants may be doubted, but, if there was, a failure on their part to sustain it will not aid the plaintiff's proof. The exception is therefore sustained.

The sixteenth conclusion is not really one of law at all; it is a hypothetical statement as to what would have happened had the defendants done something they did not do. It has no place in an adjudication and the exception thereto is sustained.

The eighteenth conclusion bears upon laches. In this regard the state of the law of trade mark and unfair competition is confused and unsatisfactory. The rule stated in some cases, including Klepser v. Furry, 289 Pa. 152, is that laches may bar the plaintiff's right to an accounting for profits but not to an injunction if he is otherwise entitled to one. In the case cited however the principle is invoked merely as a makeweight, for it is clear that the court did not consider the plaintiff guilty

of laches. Examination of other authorities leads us to doubt the accuracy of so broad and simplified a statement: See Nims on Unfair Competition and Trade-Marks (3d ed.), §409. It is needless to review and discuss the cases here, as our decision rests on other and we think adequate grounds. Suffice it to say that this plaintiff not merely neglected to assert its rights, if any it had, but stood by, inactive, and watched the defendants, year after year, build up a valuable goodwill and property in the name of Quaker City, of which we should not lightly deprive them. The plaintiff may be thought estopped to deny the defendants' right to the word Quaker, whether the delay dates only from 1929 as found by the chancellor, or from an earlier time, as we think may well be the case. The exception is therefore sustained.

The exceptions to the nineteenth and twenty-first conclusions are dismissed, but require no discussion.

The exceptions to the twenty-second, twenty-third, and twenty-fourth conclusions are, for the reasons set forth in the body of this opinion, sustained.

Certain conclusions made by the chancellor, including the first six, are not excepted to, but as they are unnecessary in the view we take of the case, clarity will best be served by eliminating them altogether and substituting the following:

1. The word Quaker is a descriptive term which the defendants were entitled to adopt as part of their trade name for motor oil unless it had previously become so closely associated with another motor oil as to be an indication of motor oil of particular origin.

2. The evidence submitted failed to show that the word Quaker had, prior to its adoption by the defendants in 1919, become an indication of the origin of motor oil.

3. The plaintiff is now estopped from complaining of the defendants' use of the word Quaker.

4. The adoption and use of the word Quaker by the defendants in the year 1919, continued to the present time, does not constitute unfair trade competition.

5. The bill must be dismissed.

As these observations dispose of the case it is unnecessary to consider the defendants' exceptions to the chancellor's refusal to affirm certain of their requests for findings of fact and conclusions of law. The exception to the decree nisi is sustained and the following order substituted therefor:

*Final decree*

And now, January 29, 1936, certain exceptions filed by defendants to the findings of fact, conclusions of law and decree nisi in the above entitled matter having been sustained, said decree nisi, entered August 8, 1935, is hereby vacated and set aside and it is ordered, adjudged, and decreed: (1) That the bill be dismissed; (2) that the plaintiff pay the costs of all proceedings.

McDevitt, P. J., dissents.